# FREYTAG ET AL. *v.* COMMISSIONER OF INTERNAL REVENUE

No. 90–762.   Argued April 23, 1991—Decided June 27, 1991

*Kathleen M. Sullivan* argued the cause for petitioners. With her on the briefs were *Brian Stuart Koukoutchos* and *Richard J. Sideman.*

*Deputy Solicitor General Roberts* argued the cause for respondent. With him on the briefs were *Solicitor General Starr, Assistant Attorney General Peterson, Stephen J. Marzen, Gary R. Allen,* and *Steven W. Parks.**

JUSTICE BLACKMUN delivered the opinion of the Court.

The leading Framers of our Constitution viewed the principle of separation of powers as the central guarantee of a just government. James Madison put it this way: "No political truth is certainly of greater intrinsic value or is stamped with the authority of more enlightened patrons of liberty." The Federalist No. 47, p. 324 (J. Cooke ed. 1961). In this litigation, we must decide whether the authority that Congress has granted the Chief Judge of the United States Tax Court to appoint special trial judges transgresses our structure of separated powers. We answer that inquiry in the negative.

I

By the Tax Reform Act of 1969, § 951, 83 Stat. 730, 26 U. S. C. § 7441, Congress "established, under article I of the Constitution of the United States, a court of record to be known as the United States Tax Court." It also empowered the Tax Court to appoint commissioners to assist its judges. § 958, 83 Stat. 734. By the Tax Reform Act of 1984, § 464(a), 98 Stat. 824, the title "commissioner" was changed to "special trial judge." By § 463(a) of that Act, 98 Stat. 824, and by § 1556(a) of the Tax Reform Act of 1986, 100 Stat. 2754, Congress authorized the Chief Judge of the Tax Court to appoint and assign these special trial judges to hear certain specifi-

---

*Erwin N. Griswold, pro se,* and *Patricia A. Dunn* filed a brief of *amicus curiae.*

cally described proceedings and "any other proceeding which the chief judge may designate." 26 U. S. C. §§ 7443A(a) and (b). The Tax Court presently consists of 19 judges appointed to 15-year terms by the President, by and with the advice and consent of the Senate. §§ 7443(a), (b), and (e).

## II

This complex litigation began with determinations of federal income tax deficiencies against the several petitioners, who had deducted on their returns approximately $1.5 billion in losses allegedly realized in a tax shelter scheme.[1] When petitioners sought review in the Tax Court in March 1982, their cases were assigned to Tax Court Judge Richard C. Wilbur. Trial began in 1984. Judge Wilbur became ill in November 1985, and the Chief Judge of the Tax Court assigned Special Trial Judge Carleton D. Powell to preside over the trial as evidentiary referee, with the proceedings videotaped. App. 2. When Judge Wilbur's illness forced his retirement and assumption of senior status effective April 1, 1986, the cases were reassigned, with petitioners' specified consent, Brief for Petitioners 8; Tr. of Oral Arg. 10, to Judge Powell for preparation of written findings and an opinion. App. 8, 12–14. The judge concluded that petitioners' tax shelter scheme consisted of sham transactions and that peti-

---

[1] At oral argument, counsel for petitioners described the litigation in this way:

"This is a tax case with implications for up to 3,000 taxpayers and a billion and a half in alleged tax deficiencies, and it involved one of the longest trials below in the tax court's history—14 weeks of evidence, complex financial testimony, 9,000 pages of transcripts, 3,000-plus exhibits." Tr. of Oral Arg. 3.

Counsel also stated petitioners' primary position:

"In other words, just to put our point succinctly, Congress did not and could not have intended special trial judges in large, complex, multiparty, multimillion dollar tax shelter cases—alleged tax shelter cases such as this one—Congress did not and could not have intended such cases to be in effect decided by the autonomous actions of a special trial judge." Id., at 17.

tioners owed additional taxes. The Chief Judge adopted Judge Powell's opinion as that of the Tax Court. 89 T. C. 849 (1987).[2]

Petitioners took an appeal to the Court of Appeals for the Fifth Circuit. It affirmed. 904 F. 2d 1011 (1990). Petitioners did not argue to the Court of Appeals, nor do they argue here, that the Tax Court is not a legitimate body. Rather, they contended that the assignment of cases as complex as theirs to a special trial judge was not authorized by § 7443A, and that this violated the Appointments Clause of the Constitution, Art. II, § 2, cl. 2. The Court of Appeals ruled that because the question of the Special Trial Judge's authority was "in essence, an attack upon the subject matter jurisdiction of the special trial judge, it may be raised for the first time on appeal." 904 F. 2d, at 1015 (footnote omitted). The court then went on to reject petitioners' claims on the merits. It concluded that the Code authorized the Chief Judge of the Tax Court to assign a special trial judge to hear petitioners' cases and that petitioners had waived any constitutional challenge to this appointment by consenting to a trial before Judge Powell. *Id.*, at 1015, n. 9.

---

[2] Petitioners place some emphasis on the facts that Special Trial Judge Powell filed his proposed findings and opinion with the Tax Court on October 21, 1987; that on that day the Chief Judge issued an order reassigning the litigation to himself for disposition, App. 15; and that on that same day the Chief Judge adopted the opinion of Judge Powell. Brief for Petitioners 8–9. Indeed, the opinion, including its appendix, covers 44 pages in the Tax Court Reports. At oral argument, however, counsel observed that Judge Powell "sometime in the preceding 4 months had filed a report with the Chief Judge of the tax court." Tr. of Oral Arg. 11. In any event, this chronology does not appear to us to be at all significant. The Chief Judge had the duty to review the work of the Special Trial Judge, and there is nothing in the record disclosing how much time he devoted to the task. As Chief Judge he was aware of the presence of the several cases in the court and the magnitude of the litigation. The burden of proof as to any negative inference to be drawn from the time factor rests on petitioners. We are not inclined to assume "rubber stamp" activity on the part of the Chief Judge.

We granted certiorari, 498 U. S. 1066 (1991), to resolve the important questions the litigation raises about the Constitution's structural separation of powers.

## III

Section 7443A(b) of the Internal Revenue Code specifically authorizes the Chief Judge of the Tax Court to assign four categories of cases to special trial judges: "(1) any declaratory judgment proceeding," "(2) any proceeding under section 7463," "(3) any proceeding" in which the deficiency or claimed overpayment does not exceed $10,000, and "(4) any other proceeding which the chief judge may designate." In the first three categories, the Chief Judge may assign the special trial judge not only to hear and report on a case but also to decide it. § 7443A(c). In the fourth category, the Chief Judge may authorize the special trial judge only to hear the case and prepare proposed findings and an opinion. The actual decision then is rendered by a regular judge of the Tax Court.

Petitioners argue that adjudication by the Special Trial Judge in this litigation exceeded the bounds of the statutory authority that Congress has conferred upon the Tax Court. Despite what they concede to be the "sweeping language" of subsection (b)(4), Brief for Petitioners 6, petitioners claim that Congress intended special trial judges to preside over only the comparatively narrow and minor matters covered by subsections (b)(1), (2), and (3).

The plain language of § 7443A(b)(4) surely authorizes the Chief Judge's assignment of petitioners' cases to a special trial judge. When we find the terms of a statute unambiguous, judicial inquiry should be complete except in rare and exceptional circumstances. *Demarest* v. *Manspeaker*, 498 U. S. 184, 190 (1991). Subsection (b)(4) could not be more clear. It states that the Chief Judge may assign "any other proceeding" to a special trial judge for duties short of "mak[ing] the decision." The subsection's text contains no

limiting term that restricts its reach to cases that are minor, simple, or narrow, as petitioners urge. We have stated that courts "are not at liberty to create an exception where Congress has declined to do so." *Hallstrom* v. *Tillamook County*, 493 U. S. 20, 27 (1989).

Nothing in the legislative history contradicts the broad sweep of subsection (b)(4)'s language. In proposing to authorize the Chief Judge to assign "any other proceeding" to the special trial judges, the Committee on Ways and Means stated that it intended "to clarify" that any other proceeding could be assigned to special trial judges "so long as a Tax Court judge must enter the decision." H. R. Rep. No. 98–432, pt. 2, p. 1568 (1984). The Report goes on to explain:

> "A technical change is made to allow the Chief Judge of the Tax Court to assign any proceeding to a special trial judge for hearing and to write proposed opinions, subject to review and final decision by a Tax Court judge, regardless of the amount in issue. However, special trial judges will not be authorized to enter decisions in this latter category of cases." *Ibid.*

The Conference Report "follows the House Bill," H. R. Conf. Rep. No. 98–861, p. 1127 (1984), and, like the House Report, indicates that Congress knowingly removed the jurisdictional requirement of a maximum amount in dispute in order to expand the authority of special trial judges to hear, but not to decide, cases covered by subsection (b)(4).

Petitioners appear not to appreciate the distinction between the special trial judges' authority to hear cases and prepare proposed findings and opinions under subsection (b)(4) and their lack of authority actually to decide those cases, which is reserved exclusively for judges of the Tax Court.[3] Because they do not distinguish between hearing a

---

[3] Petitioners also argue that the deferential standard with which Tax Court Rule 183 requires a Tax Court judge to review the factual findings of a special trial judge allows the latter not only to hear a case but effectively to resolve it. This point is not relevant to our grant of certiorari, which

case and deciding it, petitioners advance two arguments that, it seems to us, miss the mark.

Petitioners first argue that the legislative history notes that the amendment to what is now § 7443A was merely a "technical" change and cannot be read to transfer dispositive power to special trial judges. Petitioners are correct that the 1984 amendment neither transferred decisional power nor altered the substantive duties of the special trial judges. Congress has limited the authority of special trial judges to enter decisions to the narrow category of cases set forth in subsections (b)(1), (2), and (3). The scope of the special trial judges' authority to hear and decide cases, however, has little, if any, relevance to the category of cases that the special trial judges may hear but not decide.

Since the enactment of the Revenue Act of 1943, § 503, 58 Stat. 72, the Tax Court has possessed authority to appoint commissioners to assist it in particular cases. Special trial judges and their predecessors, the commissioners, have been authorized for almost a half century to hear any case before the Tax Court in the discretion of its Chief Judge. In practice, before 1984, special trial judges often heard and reported on large and complex cases. Accordingly, when Congress adopted subsection (b)(4), it codified the Chief Judge's discretion to assign cases like petitioners' to a special trial judge for hearing and preparation of a report. The 1984 amendment was "technical" in light of the historical development of the special trial judges' role; the technical nature of the amendment, however, does not alter the wide-ranging effect of the statutory text's grant of authority to the Chief Judge to assign "any other proceeding" within the Tax Court's jurisdiction to a special trial judge.

---

concerned the question whether the assignment of petitioners' cases to a special trial judge was authorized by 26 U. S. C. § 7443A(b)(4). Accordingly, we say no more about this new argument than to note that under § 7443A(c) a special trial judge has no authority to decide a case assigned under subsection (b)(4).

Petitioners also argue that the phrase "any other proceeding" is a general grant of authority to fill unintended gaps left by subsections (b)(1), (2), and (3). Reading subsection (b)(4) as a catchall provision, petitioners argue that its meaning must be limited to cases involving a small amount of money because any other interpretation would render the limitations imposed by subsections (b)(1), (2), and (3) a nullity. In support of this argument, petitioners rely on this Court's decision in *Gomez* v. *United States*, 490 U. S. 858 (1989).

We held in *Gomez* that the Federal Magistrates Act's general grant of authority allowing magistrates to "be assigned such additional duties as are not inconsistent with the Constitution and laws of the United States," 28 U. S. C. § 636(b)(3), did not permit a magistrate to supervise juror *voir dire* in a felony trial over a defendant's objection. In so holding, we explained:

> "When a statute creates an office to which it assigns specific duties, those duties outline the attributes of the office. Any additional duties performed pursuant to a general authorization in the statute reasonably should bear some relation to the specified duties." 490 U. S., at 864.

In the Magistrates Act, the list of specifically enumerated duties followed the general grant of authority and provided the outlines for the scope of the general grant. Unlike the Magistrates Act, § 7443A explicitly distinguishes between the categories of cases enumerated in subsections (b)(1), (2), and (3), which are declaratory judgment proceedings and cases involving $10,000 or less, and the category of "any other proceeding" found in subsection (b)(4).

The lesser authority exercised by special trial judges in proceedings under subsection (b)(4) also prevents that subsection from serving as a grant of general authority to fill any gaps left in the three preceding subsections. Special trial judges may hear *and* decide declaratory judgment proceedings and the limited-amount cases. A special trial judge,

however, cannot render the final decision of the Tax Court in a case assigned under subsection (b)(4). If the cases that special trial judges may hear, but not decide, under subsection (b)(4) are limited to the same kind of cases they could hear and decide under the three preceding subsections, then subsection (b)(4) would be superfluous. Our cases consistently have expressed "a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment." *Pennsylvania Dept. of Public Welfare* v. *Davenport*, 495 U. S. 552, 562 (1990). See also *Automobile Workers* v. *Johnson Controls, Inc.*, 499 U. S. 187, 201 (1991). The scope of subsection (b)(4) must be greater than that of subsections (b)(1), (2), and (3).

We conclude that subsection (b)(4) permits the Chief Judge to assign *any* Tax Court proceeding, regardless of complexity or amount, to a special trial judge for hearing and the preparation of proposed findings and written opinion. The statute's language, structure, and history permit no other conclusion.

## IV

This construction of § 7443A raises a constitutional issue to which we now must turn. Petitioners submit that if subsection (b)(4) permits a special trial judge to preside over the trial of any Tax Court case, then the statute violates the Appointments Clause of the Constitution, Art. II, § 2, cl. 2. According to petitioners, a special trial judge is an "Office[r]" of the United States who must be appointed in compliance with the Clause. The Clause reads:

> "He [the President] . . . shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law; but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in

the President alone, in the Courts of Law, or in the Heads of Departments."

Thus, the Constitution limits congressional discretion to vest power to appoint "inferior Officers" to three sources: "the President alone," "the Heads of Departments," and "the Courts of Law." Petitioners argue that a special trial judge is an "inferior Office[r]," and also contend that the Chief Judge of the Tax Court does not fall within any of the Constitution's three repositories of the appointment power.

A

We first address the Commissioner's argument that petitioners have waived their right to challenge the constitutional propriety of § 7443A. The Commissioner contends that petitioners waived this right not only by failing to raise a timely objection to the assignment of their cases to a special trial judge, but also by consenting to the assignment.

The roots of the separation-of-powers concept embedded in the Appointments Clause are structural and political. Our separation-of-powers jurisprudence generally focuses on the danger of one branch's aggrandizing its power at the expense of another branch. See *Mistretta* v. *United States*, 488 U. S. 361, 382 (1989). The Appointments Clause not only guards against this encroachment but also preserves another aspect of the Constitution's structural integrity by preventing the diffusion of the appointment power.

The Commissioner correctly notes that petitioners gave their consent to trial before the Special Trial Judge. This Court in the past, however, has exercised its discretion to consider nonjurisdictional claims that had not been raised below. See *Grosso* v. *United States*, 390 U. S. 62, 71–72 (1968); *Glidden Co.* v. *Zdanok*, 370 U. S. 530, 535–536 (1962); *Hormel* v. *Helvering*, 312 U. S. 552, 556–560 (1941). *Glidden* expressly included Appointments Clause objections to judicial officers in the category of nonjurisdictional struc-

tural constitutional objections that could be considered on appeal whether or not they were ruled upon below:

> "And in *Lamar* v. *United States*, 241 U. S. 103, 117–118, the claim that an intercircuit assignment . . . usurped the presidential appointing power under Art. II, § 2, was heard here and determined upon its merits, despite the fact that it had not been raised in the District Court or in the Court of Appeals or even in this Court until the filing of a supplemental brief upon a second request for review." *Glidden*, 370 U. S., at 536 (Harlan, J., announcing the judgment of the Court).

Like the Court in *Glidden*, we are faced with a constitutional challenge that is neither frivolous nor disingenuous. The alleged defect in the appointment of the Special Trial Judge goes to the validity of the Tax Court proceeding that is the basis for this litigation. It is true that, as a general matter, a litigant must raise all issues and objections at trial. But the disruption to sound appellate process entailed by entertaining objections not raised below does not always overcome what Justice Harlan called "the strong interest of the federal judiciary in maintaining the constitutional plan of separation of powers." *Ibid.* We conclude that this is one of those rare cases in which we should exercise our discretion to hear petitioners' challenge to the constitutional authority of the Special Trial Judge.

In reaching this conclusion, we note that we are not persuaded by the Commissioner's request that this Court defer to the Executive Branch's decision that there has been no legislative encroachment on Presidential prerogatives under the Appointments Clause in connection with § 7443A. According to the Commissioner, the structural interests implicated in this litigation are those of the Executive Branch, which can be expected to look out for itself. It is claimed, accordingly, that there is no need for this Court to be concerned about protecting the separation-of-powers interests at stake here.

We are not persuaded by this approach. The Commissioner, we believe, is in error when he assumes that the interest at stake is the Executive's own appointment power. The structural principles embodied in the Appointments Clause do not speak only, or even primarily, of Executive prerogatives simply because they are located in Article II. The Appointments Clause prevents Congress from dispensing power too freely; it limits the universe of eligible recipients of the power to appoint. Because it articulates a limiting principle, the Appointments Clause does not always serve the Executive's interests. For example, the Clause forbids Congress to grant the appointment power to inappropriate members of the Executive Branch. Neither Congress nor the Executive can agree to waive this structural protection. "The assent of the Executive to a bill which contains a provision contrary to the Constitution does not shield it from judicial review." *INS* v. *Chadha*, 462 U. S. 919, 942, n. 13 (1983). The structural interests protected by the Appointments Clause are not those of any one branch of Government but of the entire Republic.

## B

We turn to another preliminary issue in petitioners' Appointments Clause challenge. Petitioners argue that a special trial judge is an "inferior Office[r]" of the United States. If we disagree, and conclude that a special trial judge is only an employee, petitioners' challenge fails, for such "lesser functionaries" need not be selected in compliance with the strict requirements of Article II. *Buckley* v. *Valeo*, 424 U. S. 1, 126, n. 162 (1976).

The Commissioner, in contrast to petitioners, argues that a special trial judge assigned under § 7443A(b)(4) acts only as an aide to the Tax Court judge responsible for deciding the case. The special trial judge, as the Commissioner characterizes his work, does no more than assist the Tax Court judge in taking the evidence and preparing the proposed findings and opinion. Thus, the Commissioner concludes, spe-

cial trial judges acting pursuant to § 7443A(b)(4) are employees rather than "Officers of the United States."

"[A]ny appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,' and must, therefore, be appointed in the manner prescribed by § 2, cl. 2, of [Article II]." *Buckley*, 424 U. S., at 126. The two courts that have addressed the issue have held that special trial judges are "inferior Officers." The Tax Court so concluded in *First Western Govt. Securities, Inc.* v. *Commissioner*, 94 T. C. 549, 557–559 (1990), and the Court of Appeals for the Second Circuit in *Samuels, Kramer & Co.* v. *Commissioner*, 930 F. 2d 975, 985 (1991), agreed. Both courts considered the degree of authority exercised by the special trial judges to be so "significant" that it was inconsistent with the classifications of "lesser functionaries" or employees. Cf. *Go-Bart Importing Co.* v. *United States*, 282 U. S. 344, 352–353 (1931) (United States commissioners are inferior officers). We agree with the Tax Court and the Second Circuit that a special trial judge is an "inferior Office[r]" whose appointment must conform to the Appointments Clause.

The Commissioner reasons that special trial judges may be deemed employees in subsection (b)(4) cases because they lack authority to enter a final decision. But this argument ignores the significance of the duties and discretion that special trial judges possess. The office of special trial judge is "established by Law," Art. II, § 2, cl. 2, and the duties, salary, and means of appointment for that office are specified by statute. See *Burnap* v. *United States*, 252 U. S. 512, 516–517 (1920); *United States* v. *Germaine*, 99 U. S. 508, 511–512 (1879). These characteristics distinguish special trial judges from special masters, who are hired by Article III courts on a temporary, episodic basis, whose positions are not established by law, and whose duties and functions are not delineated in a statute. Furthermore, special trial judges perform more than ministerial tasks. They take testimony,

conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders. In the course of carrying out these important functions, the special trial judges exercise significant discretion.

Even if the duties of special trial judges under subsection (b)(4) were not as significant as we and the two courts have found them to be, our conclusion would be unchanged. Under §§ 7443A(b)(1), (2), and (3), and (c), the Chief Judge may assign special trial judges to render the decisions of the Tax Court in declaratory judgment proceedings and limited-amount tax cases. The Commissioner concedes that in cases governed by subsections (b)(1), (2), and (3), special trial judges act as inferior officers who exercise independent authority. But the Commissioner urges that petitioners may not rely on the extensive power wielded by the special trial judges in declaratory judgment proceedings and limited-amount tax cases because petitioners lack standing to assert the rights of taxpayers whose cases are assigned to special trial judges under subsections (b)(1), (2), and (3).

This standing argument seems to us to be beside the point. Special trial judges are not inferior officers for purposes of some of their duties under § 7443A, but mere employees with respect to other responsibilities. The fact that an inferior officer on occasion performs duties that may be performed by an employee not subject to the Appointments Clause does not transform his status under the Constitution. If a special trial judge is an inferior officer for purposes of subsections (b)(1), (2), and (3), he is an inferior officer within the meaning of the Appointments Clause and he must be properly appointed.

## C

Having concluded that the special trial judges are "inferior Officers," we consider the substantive aspect of petitioners' Appointments Clause challenge. The principle of separation of powers is embedded in the Appointments Clause. Its relevant language bears repeating: "[T]he Congress may by

Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." Congress clearly vested the Chief Judge of the Tax Court with the power to appoint special trial judges. An important fact about the appointment in this case should not be overlooked. This case does not involve an "interbranch" appointment. Cf. *Morrison* v. *Olson*, 487 U. S. 654, 675–677 (1988). However one might classify the Chief Judge of the Tax Court, there surely is nothing incongruous about giving him the authority to appoint the clerk or an assistant judge for that court. See *id.*, at 676. We do not consider here an appointment by some officer of inferior officers in, for example, the Department of Commerce or Department of State. The appointment in this case is so obviously appropriate that petitioners' burden of persuading us that it violates the Appointments Clause is indeed heavy.

Although petitioners bear a heavy burden, their challenge is a serious one. Despite Congress' authority to create offices and to provide for the method of appointment to those offices, "Congress' power . . . is inevitably bounded by the express language of Article II, cl. 2, and unless the method it provides comports with the latter, the holders of those offices will not be 'Officers of the United States.'" *Buckley*, 424 U. S., at 138–139 (discussing Congress' power under the Necessary and Proper Clause).

The "manipulation of official appointments" had long been one of the American revolutionary generation's greatest grievances against executive power, see G. Wood, The Creation of The American Republic 1776–1787, p. 79 (1969) (Wood), because "the power of appointment to offices" was deemed "the most insidious and powerful weapon of eighteenth century despotism." *Id.*, at 143. Those who framed our Constitution addressed these concerns by carefully husbanding the appointment power to limit its diffusion. Although the debate on the Appointments Clause was brief, the

sparse record indicates the Framers' determination to limit the distribution of the power of appointment. The Constitutional Convention rejected Madison's complaint that the Appointments Clause did "not go far enough if it be necessary at all": Madison argued that "Superior Officers below Heads of Departments ought in some cases to have the appointment of the lesser offices." 2 Records of the Federal Convention of 1787, pp. 627–628 (M. Farrand rev. 1966). The Framers understood, however, that by limiting the appointment power, they could ensure that those who wielded it were accountable to political force and the will of the people. Thus, the Clause bespeaks a principle of limitation by dividing the power to appoint the principal federal officers—ambassadors, ministers, heads of departments, and judges—between the Executive and Legislative Branches. See *Buckley*, 424 U. S., at 129–131. Even with respect to "inferior Officers," the Clause allows Congress only limited authority to devolve appointment power on the President, his heads of departments, and the courts of law.

With this concern in mind, we repeat petitioners' central challenge: Can the Chief Judge of the Tax Court constitutionally be vested by Congress with the power to appoint? The Appointments Clause names the possible repositories for the appointment power. It is beyond question in this litigation that Congress did not intend to grant to the President the power to appoint special trial judges. We therefore are left with three other possibilities. First, as the Commissioner urges, the Tax Court could be treated as a department with the Chief Judge as its head. Second, as the *amicus* suggests, the Tax Court could be considered one of "the Courts of Law." Third, we could agree with petitioners that the Tax Court is neither a "Departmen[t]" nor a "Cour[t] of Law." Should we agree with petitioners, it would follow that the appointment power could not be vested in the Chief Judge of the Tax Court.

We first consider the Commissioner's argument. According to the Commissioner, the Tax Court is a department because for 45 years before Congress designated that court as a "court of record" under Article I, see § 7441, the body was an independent agency (the predecessor Board of Tax Appeals) within the Executive Branch. Furthermore, the Commissioner argues that § 7441 simply changed the status of the Tax Court within that branch. It did not remove the body to a different branch or change its substantive duties.

The Commissioner "readily" acknowledges that "the Tax Court's fit within the Executive Branch may not be a perfect one." Brief for Respondent 41. But he argues that the Tax Court must fall within one of the three branches and that the Executive Branch provides its best home. The reasoning of the Commissioner may be summarized as follows: (1) The Tax Court must fit into one of the three branches; (2) it does not fit into either the Legislative Branch or the Judicial Branch; (3) at one time it was an independent agency and therefore it must fit into the Executive Branch; and (4) every component of the Executive Branch is a department.

We cannot accept the Commissioner's assumption that every part of the Executive Branch is a department, the head of which is eligible to receive the appointment power. The Appointments Clause prevents Congress from distributing power too widely by limiting the actors in whom Congress may vest the power to appoint. The Clause reflects our Framers' conclusion that widely distributed appointment power subverts democratic government. Given the inexorable presence of the administrative state, a holding that every organ in the Executive Branch is a department would multiply indefinitely the number of actors eligible to appoint. The Framers recognized the dangers posed by an excessively diffuse appointment power and rejected efforts to expand that power. See Wood 79–80. So do we. For the Chief Judge of the Tax Court to qualify as a "Hea[d] of [a] Departmen[t]," the Commissioner must demonstrate not only that the Tax

Court is a part of the Executive Branch but also that it is a department.

We are not so persuaded. This Court for more than a century has held that the term "Departmen[t]" refers only to "'a part or division of the executive government, as the Department of State, or of the Treasury,'" expressly "creat[ed]" and "giv[en] . . . the name of a department" by Congress. *Germaine*, 99 U. S., at 510–511. See also *Burnap*, 252 U. S., at 515 ("The term head of a Department means . . . the Secretary in charge of a great division of the executive branch of the Government, like the State, Treasury, and War, who is a member of the Cabinet"). Accordingly, the term "Heads of Departments" does not embrace "inferior commissioners and bureau officers." *Germaine*, 99 U. S., at 511.

Confining the term "Heads of Departments" in the Appointments Clause to executive divisions like the Cabinet-level departments constrains the distribution of the appointment power just as the Commissioner's interpretation, in contrast, would diffuse it. The Cabinet-level departments are limited in number and easily identified. Their heads are subject to the exercise of political oversight and share the President's accountability to the people.

Such a limiting construction also ensures that we interpret that term in the Appointments Clause consistently with its interpretation in other constitutional provisions. In *Germaine*, see 99 U. S., at 511, this Court noted that the phrase "Heads of Departments" in the Appointments Clause must be read in conjunction with the Opinion Clause of Art. II, §2, cl. 1. The Opinion Clause provides that the President "may require the Opinion, in writing, of the principal Officer in each of the Executive Departments," and *Germaine* limited the meaning of "Executive Departmen[t]" to the Cabinet members.

The phrase "executive departments" also appears in §4 of the Twenty-fifth Amendment, which empowers the Vice

President, together with a majority of the "principal officers of the executive departments," to declare the President "unable to discharge the powers and duties of his office." The Amendment was ratified February 10, 1967, and its language, of course, does not control our interpretation of a prior constitutional provision, such as the Appointments Clause.[4] Nevertheless, it is instructive that the hearings on the Twenty-fifth Amendment confirm that the term "department" refers to Cabinet-level entities:

> "[O]nly officials of Cabinet rank should participate in the decision as to whether presidential inability exists. . . . The intent . . . is that the Presidential appointees who direct the 10 executive departments named in 5 U. S. C. 1 [now codified as § 101], or any executive department established in the future, generally considered to comprise the President's Cabinet, would participate . . . in determining inability." H. R. Rep. No. 203, 89th Cong., 1st Sess., 3 (1965).

Even if we were not persuaded that the Commissioner's view threatened to diffuse the appointment power and was contrary to the meaning of "Departmen[t]" in the Constitution, we still could not accept his treatment of the intent of Congress, which enacted legislation in 1969 with the express purpose of "making the Tax Court an Article I court rather than an executive agency." S. Rep. No. 91–552, p. 303 (1969). Congress deemed it "anomalous to continue to clas-

---

[4] Because the language of the Twenty-fifth Amendment does not bind our interpretation of the Appointments Clause, the fact that the Amendment strictly limits the term "department" to those departments named in 5 U. S. C. § 101 does not provide a similar limitation on the term "Departmen[t]" within the meaning of the Appointments Clause. We do not address here any question involving an appointment of an inferior officer by the head of one of the principal agencies, such as the Federal Trade Commission, the Securities and Exchange Commission, the Federal Energy Regulatory Commission, the Central Intelligence Agency, and the Federal Reserve Bank of St. Louis.

sify" the Tax Court with executive agencies, *id.*, at 302, and questioned whether it was "appropriate for one executive agency [the pre-1969 tribunal] to be sitting in judgment on the determinations of another executive agency [the IRS]." *Ibid.*

Treating the Tax Court as a "Department" and its Chief Judge as its "Hea[d]" would defy the purpose of the Appointments Clause, the meaning of the Constitution's text, and the clear intent of Congress to transform the Tax Court into an Article I legislative court. The Tax Court is not a "Departmen[t]."

Having so concluded, we now must determine whether it is one of the "Courts of Law," as *amicus* suggests. Petitioners and the Commissioner both take the position that the Tax Court cannot be a "Cour[t] of Law" within the meaning of the Appointments Clause because, they say, that term is limited to Article III courts.[5]

The text of the Clause does not limit the "Courts of Law" to those courts established under Article III of the Constitution. The Appointments Clause does not provide that Congress can vest appointment power only in "one supreme Court" and other courts established under Article III, or only in tribunals that exercise broad common-law jurisdiction. Petitioners argue that Article II's reference to the "Courts of Law" must be limited to Article III courts because Article III courts are the only courts mentioned in the Constitution. It of course is true that the Constitution "nowhere makes reference to 'legislative courts.'" See *Glidden*, 370 U. S., at 543. But petitioners' argument fails nevertheless. We

---

[5] The Commissioner has not been consistent in this position. Indeed, when the present litigation was in the Fifth Circuit, the Government advocated that the Tax Court is one of the "Courts of Law." Brief for Appellee in No. 89–4436 et al., pp. 47–51. It abandoned that position in the later case of *Samuels, Kramer & Co.* v. *Commissioner*, 930 F. 2d 975 (CA2 1991), and there urged that the Tax Court was a "Department." Brief for Appellee in No. 89–4436 et al., pp. 34–48.

agree with petitioners that the Constitution's terms are illuminated by their cognate provisions. This analytic method contributed to our conclusion that the Tax Court could not be a department. Petitioners, however, underestimate the importance of this Court's time-honored reading of the Constitution as giving Congress wide discretion to assign the task of adjudication in cases arising under federal law to legislative tribunals. See, *e. g., American Insurance Co.* v. *Canter*, 1 Pet. 511, 546 (1828) (the judicial power of the United States is not limited to the judicial power defined under Article III and may be exercised by legislative courts); *Williams* v. *United States*, 289 U. S. 553, 565–567 (1933) (same).

Our cases involving non-Article III tribunals have held that these courts exercise the judicial power of the United States. In both *Canter* and *Williams*, this Court rejected arguments similar to the literalistic one now advanced by petitioners, that only Article III courts could exercise the judicial power because the term "judicial Power" appears only in Article III. In *Williams*, this Court explained that the power exercised by some non-Article III tribunals *is* judicial power:

> "The Court of Claims . . . undoubtedly . . . exercises judicial power, but the question still remains—and is the vital question—whether it is the judicial power defined by Art. III of the Constitution.
>
> "That judicial power apart from that article may be conferred by Congress upon legislative courts . . . is plainly apparent from the opinion of Chief Justice Marshall in *American Insurance Co.* v. *Canter* . . . dealing with the territorial courts. . . . [T]he legislative courts possess and exercise judicial power . . . although not conferred in virtue of the third article of the Constitution." 289 U. S., at 565–566.

We cannot hold that an Article I court, such as the Court of Claims in *Williams* or the Territorial Court of Florida in

*Canter*, can exercise the judicial power of the United States and yet cannot be one of the "Courts of Law."

Nothing in *Buckley* v. *Valeo* contradicts this conclusion. While this Court in *Buckley* paraphrased the Appointments Clause to allow the appointment of inferior officers "by the President alone, by the heads of departments, or by the Judiciary," 424 U. S., at 132, we did not hold that "Courts of Law" consist only of the Article III judiciary. The appointment authority of the "Courts of Law" was not before this Court in *Buckley*. Instead, we were concerned with whether the appointment of Federal Elections Commissioners by Congress was constitutional under the Appointments Clause.

The narrow construction urged by petitioners and the Commissioner also would undermine longstanding practice. "[F]rom the earliest days of the Republic," see *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 64 (1982), Congress provided for the creation of legislative courts and authorized those courts to appoint clerks, who were inferior officers. See, *e. g., In re Hennen*, 13 Pet. 230 (1839). Congress' consistent interpretation of the Appointments Clause evinces a clear congressional understanding that Article I courts could be given the power to appoint. Because "'traditional ways of conducting government . . . give meaning' to the Constitution," *Mistretta*, 488 U. S., at 401, quoting *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 610 (1952) (concurring opinion), this longstanding interpretation provides evidence that Article I courts are not precluded from being "Courts of Law" within the meaning of the Appointments Clause.

Having concluded that an Article I court, which exercises judicial power, can be a "Cour[t] of Law" within the meaning of the Appointments Clause, we now examine the Tax Court's functions to define its constitutional status and its role in the constitutional scheme. See *Williams*, 289 U. S., at 563–567. The Tax Court exercises judicial, rather than

executive, legislative, or administrative, power. It was established by Congress to interpret and apply the Internal Revenue Code in disputes between taxpayers and the Government. By resolving these disputes, the court exercises a portion of the judicial power of the United States.

The Tax Court exercises judicial power to the exclusion of any other function. It is neither advocate nor rulemaker. As an adjudicative body, it construes statutes passed by Congress and regulations promulgated by the Internal Revenue Service. It does not make political decisions.

The Tax Court's function and role in the federal judicial scheme closely resemble those of the federal district courts, which indisputably are "Courts of Law." Furthermore, the Tax Court exercises its judicial power in much the same way as the federal district courts exercise theirs. It has authority to punish contempts by fine or imprisonment, 26 U. S. C. § 7456(c); to grant certain injunctive relief, § 6213(a); to order the Secretary of the Treasury to refund an overpayment determined by the court, § 6512(b)(2); and to subpoena and examine witnesses, order production of documents, and administer oaths, § 7456(a). All these powers are quintessentially judicial in nature.

The Tax Court remains independent of the Executive and Legislative Branches. Its decisions are not subject to review by either the Congress or the President. Nor has Congress made Tax Court decisions subject to review in the federal district courts. Rather, like the judgments of the district courts, the decisions of the Tax Court are appealable only to the regional United States courts of appeals, with ultimate review in this Court. The courts of appeals, moreover, review those decisions "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." § 7482(a). This standard of review contrasts with the standard applied to agency rulemaking by the courts of appeals under § 10(e) of the Administrative Procedure Act, 5 U. S. C. § 706(2)(A). See *Motor Vehicle Mfrs.*

*Assn.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43–44 (1983).

The Tax Court's exclusively judicial role distinguishes it from other non-Article III tribunals that perform multiple functions and provides the limit on the diffusion of appointment power that the Constitution demands. Moreover, since the early 1800's, Congress regularly granted non-Article III territorial courts the authority to appoint their own clerks of court, who, as of at least 1839, were "inferior Officers" within the meaning of the Appointments Clause. See *In re Hennen*, 13 Pet., at 258. Including Article I courts, such as the Tax Court, that exercise judicial power and perform exclusively judicial functions among the "Courts of Law" does not significantly expand the universe of actors eligible to receive the appointment power.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE SCALIA, with whom JUSTICE O'CONNOR, JUSTICE KENNEDY, and JUSTICE SOUTER join, concurring in part and concurring in the judgment.

I agree with the Court that 26 U. S. C. § 7443A allows the Chief Judge of the Tax Court to assign special trial judges to preside over proceedings like those involved here, and join Parts I, II, and III of its opinion. I disagree, however, with the Court's decision to reach, as well as its resolution of, the Appointments Clause issue.

I

As an initial matter, I think the Court errs by entertaining petitioners' constitutional challenge on the merits. Petitioners not only failed to object at trial to the assignment of their case to a special trial judge, but expressly consented to that assignment. It was only after the judge ruled against them that petitioners developed their current concern over whether his appointment violated Article II, § 2, cl. 2, of the

Constitution. They raised this important constitutional question for the first time in their appeal to the Fifth Circuit. That court concluded that petitioners had "waived this objection" by consenting to the assignment of their case. 904 F. 2d 1011, 1015, n. 9 (1990). When we granted certiorari, we asked the parties to brief and argue the following additional question: "Does a party's consent to have its case heard by a special tax judge constitute a waiver of any right to challenge the appointment of that judge on the basis of the Appointments Clause, Art. II, §2, cl. 2?" 498 U. S. 1066 (1991).

Petitioners would have us answer that question "no" by adopting a general rule that "structural" constitutional rights as a class simply *cannot* be forfeited, and that litigants are entitled to raise them at any stage of litigation. The Court neither accepts nor rejects that proposal—and indeed, does not even mention it, though the opinion does dwell upon the structural nature of the present constitutional claim, *ante*, at 878–880. Nor does the Court in any other fashion answer the question we specifically asked to be briefed, choosing instead to say that, in the present case, it will "exercise our discretion" to entertain petitioners' constitutional claim. *Ante*, at 879. Thus, when there occurs a similar forfeiture of an Appointments Clause objection—or of some other allegedly structural constitutional deficiency—the courts of appeals will remain without guidance as to whether the forfeiture must, or even may, be disregarded. (The Court refers to this case as "one of th[e] rare" ones in which forfeiture will be ignored, *ibid.*—but since all forfeitures of Appointments Clause rights, and arguably even all forfeitures of structural constitutional rights, can be considered "rare," this is hardly useful guidance.) Having asked for this point to be briefed and argued, and having expended our time in considering it, we should provide an answer. In my view the answer is that Appointments Clause claims, and other structural constitutional claims, have no special entitlement to review. A party forfeits the right to advance on appeal a nonjuris-

dictional claim, structural or otherwise, that he fails to raise at trial. Although I have no quarrel with the proposition that appellate courts may, in truly exceptional circumstances, exercise discretion to hear forfeited claims, I see no basis for the assertion that the structural nature of a constitutional claim in and of itself constitutes such a circumstance; nor do I see any other exceptional circumstance in the present case. Cf. *Peretz* v. *United States, post,* at 954–955 (SCALIA, J., dissenting). I would therefore reject petitioners' sweeping proposition that structural constitutional rights as a class cannot be waived or forfeited and would refuse to entertain the constitutional challenge presented here.[1]

"No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." *Yakus* v. *United States,* 321 U. S. 414, 444 (1944); see also *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 238–239 (1940). Forfeiture[2] is "not a mere technicality and

---

[1] I have no quarrel with the Court's decision to entertain petitioners' statutory claim on the merits, as that claim was resolved on the merits by the Court of Appeals. See *Virginia Bankshares, Inc.* v. *Sandberg, post,* at 1099, n. 8 (1991).

[2] The Court uses the term "waive" instead of "forfeit," see *ante,* at 878–880. The two are really not the same, although our cases have so often used them interchangeably that it may be too late to introduce precision. Waiver, the "intentional relinquishment or abandonment of a known right or privilege," *Johnson* v. *Zerbst,* 304 U. S. 458, 464 (1938), is merely one means by which a forfeiture may occur. Some rights may be forfeited by means short of waiver, see, *e. g., Levine* v. *United States,* 362 U. S. 610, 619 (1960) (right to public trial); *United States* v. *Bascaro,* 742 F. 2d 1335, 1365 (CA11 1984) (right against double jeopardy), cert. denied *sub nom. Hobson* v. *United States,* 472 U. S. 1017 (1985); *United States* v. *Whitten,* 706 F. 2d 1000, 1018, n. 7 (CA9 1983) (right to confront adverse witnesses), cert. denied, 465 U. S. 1100 (1984), but others may not, see, *e. g., Johnson, supra* (right to counsel); *Patton* v. *United States,* 281 U. S. 276, 312 (1930) (right to trial by jury). A right that cannot be waived cannot be

is essential to the orderly administration of justice." 9 C. Wright & A. Miller, Federal Practice and Procedure § 2472, p. 455 (1971). In the federal judicial system, the rules generally governing the forfeiture of claims are set forth in Federal Rules of Criminal Procedure 51 and 52(b) and Federal Rule of Civil Procedure 46. The Tax Court, which is not an Article III court, has adopted a rule virtually identical to the latter, Tax Court Rule 144. These rules reflect the principle that a trial on the merits, whether in a civil or criminal case, is the "main event," and not simply a "tryout on the road" to appellate review. Cf. *Wainwright* v. *Sykes*, 433 U. S. 72, 90 (1977). The very word "review" presupposes that a litigant's arguments have been raised and considered in the tribunal of first instance. To abandon that principle is to encourage the practice of "sandbagging": suggesting or permitting, for strategic reasons, that the trial court pursue a certain course, and later—if the outcome is unfavorable— claiming that the course followed was reversible error.

The blanket rule that "argument[s] premised on the Constitution's structural separation of powers [are] not a matter of personal rights and therefore [are] not waivable," Brief for Petitioners 43–44, would erode this cardinal principle of sound judicial administration. It has no support in principle or in precedent or in policy.

As to principle: Personal rights that happen to bear upon governmental structure are no more laden with public interest (and hence inherently nonwaivable by the individual) than many other personal rights one can conceive of. First

---

forfeited by other means (at least in the same proceeding), but the converse is not true.

In this case, petitioners expressly consented to the Special Trial Judge's role. As far as my analysis is concerned, however, it would not matter if an even more inadvertent forfeiture were involved—that is, if petitioners had not even consented but had merely failed to object in timely fashion. I shall not try to retain the distinction between waiver and forfeiture throughout this opinion, since many of the sources I shall be using disregard it.

Amendment free-speech rights, for example, or the Sixth Amendment right to a trial that is "public," provide benefits to the entire society more important than many structural guarantees; but if the litigant does not assert them in a timely fashion, he is foreclosed. See, e. g., *Head* v. *New Mexico Bd. of Examiners in Optometry*, 374 U. S. 424, 432–433, n. 12 (1963) (First Amendment); *Levine* v. *United States*, 362 U. S. 610, 619 (1960) (Sixth Amendment). Nor is it distinctively true of structural guarantees that litigants often may undervalue them. Many criminal defendants, for example, would prefer a trial from which the press is excluded.

It is true, of course, that a litigant's prior agreement to a judge's expressed intention to disregard a structural limitation upon his power cannot have any *legitimating* effect— i. e., cannot render that disregard *lawful*. Even if both litigants not only agree to, but themselves propose, such a course, the judge must tell them no. But the question before us here involves the effect of waiver not *ex ante* but *ex post*—its effect not upon right but upon *remedy:* Must a judgment already rendered be set aside because of an alleged structural error to which the losing party did not properly object? There is no reason in principle why that should always be so. It will sometimes be so—not, however, because the error was structural, but because, whether structural or not, it deprived the federal court of its requisite subject-matter jurisdiction. Such an error may be raised by a party, and indeed must be noticed *sua sponte* by a court, at all points in the litigation, see, e. g., *American Fire & Casualty Co.* v. *Finn*, 341 U. S. 6, 17–18 (1951); *Mansfield, C. & L. M. R. Co.* v. *Swan*, 111 U. S. 379, 382 (1884); *Capron* v. *Van Noorden*, 2 Cranch 126, 127 (1804). Since such a jurisdictional defect deprives not only the initial court but also the appellate court of its power over the case or controversy, to permit the appellate court to ignore it because of waiver would be to give the waiver legitimating, as opposed to merely remedial, effect, i. e., the effect of approving, *ex*

*ante,* unlawful action by the appellate court itself. That this, rather than any principle of perpetual remediability of structural defects, is the basis for the rule of "nonwaivability" of lack of subject-matter jurisdiction is demonstrated by the fact that a final judgment cannot be attacked *collaterally*— *i. e.,* before a court that *does* have jurisdiction—on the ground that a subject-matter jurisdictional limitation (structural or not) was ignored. See, *e. g., Insurance Corp. of Ireland* v. *Compagnie des Bauxites de Guinee,* 456 U. S. 694, 702, n. 9 (1982).

As to precedent: Petitioners place primary reliance on some broad language in *Commodity Futures Trading Comm'n* v. *Schor,* 478 U. S. 833 (1986). We said in that case that "[w]hen these Article III limitations are at issue" (referring not to all structural limitations of the Constitution, but only to those of Article III, §§ 1 and 2) "notions of consent and waiver cannot be dispositive." 478 U. S., at 851. But the claim before us in *Schor* involved a particular sort of structural defect (a tribunal's exceeding its subject-matter jurisdiction) which, as I have just described, had traditionally been held nonwaivable on appeal in the context of Article III tribunals. To extend the same treatment to similar defects in the context of non-Article III tribunals is quite natural, whether or not it is analytically required. Cf., *e. g., Clapp* v. *Commissioner,* 875 F. 2d 1396, 1399 (CA9 1989) ("While the Tax Court is an Article I court, . . . the few cases discussing the differences between the Tax Court and an Article III court indicate that questions of Tax Court jurisdiction are to be resolved in the same manner as for an Article III court"). It is clear from our opinion in *Schor* that we had the analogy to Article III subject-matter jurisdiction in mind. "To the extent that this structural principle is implicated in a given case," we said, "the parties cannot by consent cure the constitutional difficulty for the same reason that the parties by consent cannot confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III, § 2."

478 U. S., at 850–851.[3]   I would not extend that nonwaiver rule—a traditional rule in its application to Article III courts, and understandably extended to other federal adjudicative tribunals—to structural defects that do not call into question the jurisdiction of the forum.   The subject-matter jurisdiction of the forum that issued the judgment, the Tax Court, is not in question in the present case.

Petitioners only other appeal to precedent is *Glidden Co.* v. *Zdanok*, 370 U. S. 530 (1962).   That case did address a nonjurisdictional structural defect that had not been raised below.   As the Court explains, however, that was a structural defect that went to the validity of the very proceeding under review, *ante*, at 879, as opposed to one that merely affected the validity of the claim—for example, improper appointment of the Executive officer who issued the regulation central to the controversy.   That was considered significant by the only opinion in the case (that of Justice Harlan, joined by Justices Brennan and Stewart) to address the waiver point.   ("The alleged defect of authority here relates to basic constitutional protections *designed in part for the benefit of litigants.*"  *Id.*, at 536 (emphasis added).)   The formulation petitioners advance, of course, is much broader than that. ("[A]n argument premised on the Constitution's structural separation of powers is not a matter of personal rights and

---

[3] Ironically enough, the categorical "no-waiver" rule that petitioners propose would destroy the very parallelism between administrative and judicial tribunals that *Schor* sought to achieve.   For we have held that, in the administrative context, the use of unauthorized personnel to conduct a hearing (a hearing examiner not properly appointed pursuant to the Administrative Procedure Act) would not justify judicial reversal of the agency decision where no objection was lodged before the agency itself: "[W]e hold that the defect in the examiner's appointment was an irregularity which would invalidate a resulting order if the Commission had overruled an appropriate objection made during the hearings.   But it is not one which deprives the Commission of power or jurisdiction, so that even in the absence of timely objection its order should be set aside as a nullity." *United States* v. *L. A. Tucker Truck Lines, Inc.*, 344 U. S. 33, 38 (1952).

therefore *is not waivable."* Brief for Petitioners 43–44 (emphasis added)). "There can be no hierarchy among separation of powers principles, in which some are fundamental and nonwaivable while the vindication of others may be relegated to the vagaries of individual litigation strategies." *Id.,* at 45.) Even more important, Justice Harlan's plurality opinion in *Glidden* does not stand for the proposition that forfeiture can *never* be imposed, but rather the more limited proposition, which the Court reiterates today, that forfeiture need not *always* be imposed.

Several recent opinions flatly contradict petitioners' blanket assertion that structural claims cannot be waived. Surely under our jurisprudence the so-called negative Commerce Clause is structural. See *Dennis* v. *Higgins,* 498 U. S. 439, 447 (1991). And surely the supposed guarantee against waivability must apply in state courts as well as in federal courts, since according to petitioners it emanates from the structural rights themselves. Yet only last Term, in *Jimmy Swaggart Ministries* v. *Board of Equalization of California,* 493 U. S. 378, 397 (1990), we declined to consider a negative Commerce Clause challenge to a state tax because state courts had found the issue procedurally barred as a result of petitioner's failure to raise it in his administrative proceeding for a tax refund. And in *G. D. Searle & Co.* v. *Cohn,* 455 U. S. 404, 414 (1982), we declined to reach a negative Commerce Clause claim in litigation arising in the federal courts; we remanded the case for consideration of that issue by the Court of Appeals, *"if it was properly raised below."* (Emphasis added.) The Federal Courts of Appeals (even after *Schor*) have routinely applied the ordinary rules of forfeiture to structural claims not raised below. See, *e. g., United States* v. *Doremus,* 888 F. 2d 630, 633, n. 3 (CA9 1989) (separation of powers claims), cert. denied, 498 U. S. 1046 (1991); *Opdyke Investment Co.* v. *Detroit,* 883 F. 2d 1265, 1276 (CA6 1989) (same); *Interface Group, Inc.* v.

*Massachusetts Port Authority*, 816 F. 2d 9, 16 (CA1 1987) (Breyer, J.) (Supremacy and Commerce Clause claims).

Finally, as to policy: The need for the traditional forfeiture rule—in cases involving structural claims as in all others—is obvious. Without that incentive to raise legal objections as soon as they are available, the time of lower court judges and of juries would frequently be expended uselessly, and appellate consideration of difficult questions would be less informed and less complete. Besides inviting these evils, the categorical rule petitioners advance would require the development of a whole new body of jurisprudence concerning which constitutional provisions are "structural"—a question whose answer is by no means clear. Cf. Sunstein, Government Control of Information, 74 Calif. L. Rev. 889, 915 (1986) (arguing that the First Amendment is structural). Moreover, since that rigid rule would cut so much against the grain of reason and practice, it would have the side effect of distorting substantive law. The maxim *volenti non fit injuria* has strong appeal in human affairs, and, by requiring it to be absolutely and systematically disregarded in cases involving structural protections of the Constitution, we would incline ourselves towards finding that no such structural protection exists.

Thus, the structural nature of the claim here is not sufficient reason to ignore its forfeiture—and the Court (though it discusses the virtues of structure at some length) does not pretend otherwise. There must be some additional reason, then, why the Court "exercise[s] our discretion," *ante*, at 879, to disregard the forfeiture. To disregard it without sufficient reason is the exercise not of discretion but of whimsy. Yet beyond its discussion of structure, the only reason the Court gives is no reason at all: "we are faced with a constitutional challenge that is neither frivolous nor disingenuous," *ibid*. That describes the situation with regard to the vast majority of forfeited claims raised on appeal. As we make clear in another case decided this very day, waiver generally

extends not merely to "frivolous" and "disingenuous" challenges, but even to "[t]he most basic rights of criminal defendants." *Peretz, post*, at 936. Here, petitioners expressly consented to the Special Trial Judge. Under 26 U. S. C. § 7443A, the Chief Judge of that court has broad discretion to assign cases to special trial judges. Any party who objects to such an assignment, if so inclined, can easily raise the constitutional issue pressed today. Under these circumstances, I see no reason why this should be included among those "rare cases in which we should exercise our discretion," *ante*, at 879, to hear a forfeited claim.

## II

Having struggled to reach petitioners' Appointments Clause objection, the Court finds it invalid. I agree with that conclusion, but the reason the Court assigns is in my view both wrong and full of danger for the future of our system of separate and coequal powers.

The Appointments Clause provides:

> "[T]he Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." Art. II, § 2, cl. 2.

I agree with the Court that a special trial judge is an "inferior Office[r]" within the meaning of this Clause, with the result that, absent Presidential appointment, he must be appointed by a court of law or the head of a department. I do not agree, however, with the Court's conclusion that the Tax Court is a "Cour[t] of Law" within the meaning of this provision. I would find the appointment valid because the Tax Court is a "Departmen[t]" and the Chief Judge is its head.

## A

A careful reading of the Constitution and attention to the apparent purpose of the Appointments Clause make it clear that the Tax Court cannot be one of those "Courts of Law"

referred to there. The Clause does not refer generally to "Bodies exercising judicial Functions," or even to "Courts" generally, or even to "Courts of Law" generally. It refers to *"the* Courts of Law." Certainly this does not mean *any* "Cour[t] of Law" (the Supreme Court of Rhode Island would not do). The definite article "the" obviously narrows the class of eligible "Courts of Law" to those courts of law envisioned by the Constitution. Those are Article III courts, and the Tax Court is not one of them.

The Court rejects this conclusion because the Appointments Clause does not (in the style of the Uniform Commercial Code) contain an explicit cross-reference to Article III. *Ante,* at 888–889. This is no doubt true, but irrelevant. It is equally true that Article I, § 8, cl. 9, which provides that Congress may "constitute Tribunals inferior to the supreme Court," does not explicitly say "Tribunals under Article III, below." Yet, this power "plainly relates to the 'inferior Courts' provided for in Article III, § 1; it has never been relied on for establishment of any other tribunals." *Glidden Co.* v. *Zdanok,* 370 U. S., at 543 (opinion of Harlan, J.); see also 3 J. Story, Commentaries on the Constitution of the United States § 1573, p. 437 (1833). Today's Court evidently does not appreciate, as Chief Justice Marshall did, that the Constitution does not "partake of the prolixity of a legal code," *McCulloch* v. *Maryland,* 4 Wheat. 316, 407 (1819). It does not, like our opinions, bristle with *"supras," "infras,"* and footnotes. Instead of insisting upon such legalisms, we should, I submit, follow the course mapped out in *Buckley* v. *Valeo,* 424 U. S. 1, 124 (1976) *(per curiam),* and examine the Appointments Clause of the Constitution in light of the "cognate provisions" of which it is a central feature: Article I, Article II, and Article III. The only "Courts of Law" referred to there are those authorized by Article III, § 1, whose judges serve during good behavior with undiminishable salary. Art. III, § 1. See *Glidden Co.* v. *Zdanok, supra,* at 543 (opinion of Harlan, J.); *United States* v. *Mouat,* 124

U. S. 303, 307 (1888) ("courts of justice") (dictum). The Framers contemplated no other national judicial tribunals. "According to the plan of the convention, *all* judges who may be appointed by the United States are to hold their offices *during good behavior* . . . ." The Federalist No. 78, p. 465 (C. Rossiter ed. 1961) (A. Hamilton) (second emphasis in original).

We recognized this in *Buckley, supra,* and it was indeed an essential part of our reasoning. Responding to the argument that a select group of Congressmen was a "Department," we said:

> "The phrase 'Heads of Departments,' used as it is in conjunction with the phrase 'Courts of Law,' suggests that the Departments referred to are themselves in the Executive Branch or at least have some connection with that branch. While the Clause expressly authorizes Congress to vest the appointment of certain officers in the 'Courts of Law,' the absence of similar language to include Congress must mean that neither Congress nor its officers were included within the language 'Heads of Departments' in this part of cl. 2.

> "Thus, with respect to four of the six voting members of the Commission, neither the President, the head of any department, *nor the Judiciary* has any voice in their selection." *Id.,* at 127 (emphasis added).

The whole point of this passage is that "the Heads of Departments" must reasonably be understood to refer exclusively to the Executive Branch (thereby excluding officers of Congress) because "the Courts of Law" obviously refers exclusively to the Judicial Branch. We were right in *Buckley,* and the Court is wrong today.

Even if the Framers had no particular purpose in making the Appointments Clause refer only to Article III courts, we would still of course be bound by that disposition. In fact, however, there is every reason to believe that the Appointments Clause's limitation to Article III tribunals was adopted

with calculation and forethought, faithfully implementing a considered political theory for the appointment of officers.

The Framers' experience with postrevolutionary self-government had taught them that combining the power to create offices with the power to appoint officers was a recipe for legislative corruption.[4] The foremost danger was that legislators would create offices with the expectancy of occupying them themselves. This was guarded against by the Incompatibility and Ineligibility Clauses, Article I, §6, cl. 2. See *Buckley*, *supra*, at 124. But real, if less obvious, dangers remained. Even if legislators could not appoint themselves, they would be inclined to appoint their friends and supporters. This proclivity would be unchecked because of the lack of accountability in a multimember body—as

---

[4] The Court apparently thinks that the Appointments Clause was designed to check executive despotism. *Ante*, at 883–884. This is not what we said in *Buckley* v. *Valeo*, 424 U. S. 1, 129 (1976), and it is quite simply contrary to historical fact. The quotations on which the Court relies describe abuses by the unelected royal governors and the Crown, who possessed the power to create and fill offices. The drafters of several early State Constitutions reacted to these abuses by lodging the appointment power in the legislature. See, *e. g.*, Va. Const. (1776) (legislature appoints judges); cf. Articles of Confederation, Art. IX (Congress appoints courts and officers of land forces). Americans soon learned, however, that "in a representative republic where the executive magistracy is carefully limited . . . it is against the enterprising ambition of the [legislative] department that the people ought to indulge all their jealousy and exhaust all their precautions." The Federalist No. 48, p. 309 (C. Rossiter ed. 1961) (J. Madison). Soon after the revolution, "[t]he appointing authority which in most constitutions had been granted to the assemblies had become the principal source of division and faction in the states." G. Wood, The Creation of The American Republic, 1776–1787, p. 407 (1969). By 1780, States were reacting to *these* abuses by reposing appointment authority in the executive. See Mass. Const., Part The Second, Chapter II, §1, Art. IX (1780); N. H. Const. (1784) (officers appointed by president and a council). On legislative despotism, see generally Wood, *supra*, at 403–409. The Framers followed the lead of these later Constitutions. The Appointments Clause is, intentionally and self-evidently, a limitation on *Congress*.

James Wilson pointed out in his criticism of a multimember executive:

> "[A]re impartiality and fine discernment likely to predominate in a numerous [appointing] body? In proportion to their own number, will be the number of their friends, favorites and dependents. An office is to be filled. A person nearly connected, by some of the foregoing ties, with one of those who [is] to vote in filling it, is named as a candidate. . . . Every member, who gives, on his account, a vote for his friend, will expect the return of a similar favor on the first convenient opportunity. In this manner, a reciprocal intercourse of partiality, of interestedness, of favoritism, perhaps of venality, is established; and in no particular instance, is there a practicability of tracing the poison to its source. Ignorant, vicious, and prostituted characters are introduced into office; and some of those, who voted, and procured others to vote for them, are the first and loudest in expressing their astonishment, that the door of admission was ever opened to men of their infamous description. The suffering people are thus wounded and buffeted, like Homer's Ajax, in the dark; and have not even the melancholy satisfaction of knowing by whom the blows are given." 1 Works of James Wilson 359–360 (J. Andrews ed. 1896).

See also Essex Result, in Memoir of Theophilus Parsons 381–382 (1859); The Federalist No. 76, pp. 455–457 (C. Rossiter ed. 1961) (A. Hamilton). And not only would unaccountable legislatures introduce their friends into necessary offices, they would create unnecessary offices into which to introduce their friends. As James Madison observed:

> "The power of the Legislature to appoint any other than their own officers departs too far from the Theory which requires a separation of the great Departments of Government. One of the best securities against the cre-

ation of unnecessary offices or tyrannical powers is an exclusion of the authors from all share in filling the one, or influence in the execution of the other." Madison's Observations on Jefferson's Draft of a Constitution for Virginia, reprinted in 6 Papers of Thomas Jefferson 308, 311 (J. Boyd ed. 1952).

For these good and sufficient reasons, then, the federal appointment power was removed from Congress. The Framers knew, however, that it was not enough simply to define in writing who would exercise this power or that. "After discriminating . . . in theory, the several classes of power, as they may in their nature be legislative, executive, or judiciary, the next and most difficult task [was] to provide some practical security for each, against the invasion of the others." The Federalist No. 48, p. 308 (C. Rossiter ed. 1961) (J. Madison). Invasion by the Legislature, of course, was the principal threat, since the "legislative authority . . . possesses so many means of operating on the motives of the other departments." Id., No. 49, p. 314 (J. Madison). It can "mask, under complicated and indirect measures, the encroachments which it makes on the co-ordinate departments," id., No. 48, p. 310 (J. Madison), and thus control the nominal actions (e. g., appointments) of the other branches. Cf. T. Jefferson, Notes on the State of Virginia 120 (W. Peden ed. 1955).

Thus, it was not enough simply to repose the power to execute the laws (or to appoint) in the President; it was also necessary to provide him with the means to resist legislative encroachment upon that power. The means selected were various, including a separate political constituency, to which he alone was responsible, and the power to veto encroaching laws, see Art. I, §7, or even to disregard them when they are unconstitutional. See Easterbrook, Presidential Review, 40 Case W. Res. L. Rev. 905, 920–924 (1990). One of the most obvious and necessary, however, was a permanent salary. Art. II, §1. Without this, "the separation of the

executive from the legislative department would be merely nominal and nugatory. The legislature, with a discretionary power over the salary and emoluments of the Chief Magistrate, could render him as obsequious to their will as they might think proper to make him." The Federalist No. 73, p. 441 (C. Rossiter ed. 1961) (A. Hamilton). See also *id.*, No. 51, p. 321 (J. Madison); Mass. Const., Part The Second, Chapter II, § 1, Art. XIII (1780).

A power of appointment lodged in a President surrounded by such structural fortifications could be expected to be exercised independently, and not pursuant to the manipulations of Congress. The same is true, to almost the same degree, of the appointment power lodged in the heads of departments. Like the President, these individuals possess a reputational stake in the quality of the individuals they appoint; and though they are not themselves able to resist congressional encroachment, they are directly answerable to the President, who is responsible to *his* constituency for their appointments and has the motive and means to assure faithful actions by his direct lieutenants.

Like the President, the Judicial Branch was separated from Congress not merely by a paper assignment of functions, but by endowment with the means to resist encroachment—foremost among which, of course, are life tenure (during "good behavior") and permanent salary. These structural accoutrements not only assure the fearless adjudication of cases and controversies, see The Federalist Nos. 78, 79 (A. Hamilton); *Northern Pipeline Constr. Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 57–60 (1982) (opinion of Brennan, J.); they also render the Judiciary a potential repository of appointment power free of congressional (as well as Presidential) influence. In the same way that depositing appointment power in a fortified President and his lieutenants ensures an *actual* exclusion of the legislature from appointment, so too does reposing such power in an Article III court. The Court's holding, that Congress may deposit

such power in "legislative courts," without regard to whether their personnel are either Article III judges *or* "Heads of Departments," utterly destroys this carefully constructed scheme. And the Court produces this result, I remind the reader, not because of, but *in spite of,* the apparent meaning of the phrase "the Courts of Law."

### B

Having concluded, against all odds, that "the Courts of Law" referred to in Article II, § 2, are not the courts of law established by Article III, the Court is confronted with the difficult problem of determining what courts of law they *are.* It acknowledges that they must be courts which exercise "the judicial power of the United States" and concludes that the Tax Court is such a court—even though it is not an Article III court. This is quite a feat, considering that Article III begins *"The* judicial Power of the United States"—not *"Some of* the judicial Power of the United States," or even *"Most of* the judicial Power of the United States"—"shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." Despite this unequivocal text, the Court sets forth the startling proposition that "the judicial power of the United States is not limited to the judicial power defined under Article III." *Ante,* at 889. It turns out, however—to our relief, I suppose it must be said—that this is really only a pun. "The judicial power," as the Court uses it, bears no resemblance to the constitutional term of art we are all familiar with, but means only "the power to adjudicate in the manner of courts." So used, as I shall proceed to explain, the phrase covers an infinite variety of individuals exercising *executive* rather than *judicial* power (in the constitutional sense), and has nothing to do with the separation of powers or with any other characteristic that might cause one to believe *that* is what was meant by "the Courts of Law." As far as I can tell, the only thing to be said for this approach is that it makes the Tax

Court a "Cour[t] of Law"—which is perhaps the object of the exercise.

I agree with the unremarkable proposition that "Congress [has] wide discretion to assign the task of adjudication in cases arising under federal law to legislative tribunals." *Ante*, at 889. Congress may also assign that task to subdivisions of traditional executive departments, as it did in 1924 when it created the Tax Court's predecessor, the Tax Board of Appeals—or to take a more venerable example, as it did in 1791 when it created within the Treasury Department the Comptroller of the United States, who "decide[d] on appeal, without further review by the Secretary, all claims concerning the settlement of accounts." Casper, An Essay in Separation of Powers: Some Early Versions and Practices, 30 Wm. & Mary L. Rev. 211, 238 (1989); see 1 Stat. 66. Such tribunals, like any other administrative board, exercise the executive power, not the judicial power of the United States. They are, in the words of the great Chief Justice, "incapable of receiving [the judicial power]"—unless their members serve for life during good behavior and receive permanent salary. *American Ins. Co.* v. *Canter*, 1 Pet. 511, 546 (1828) (Marshall, C. J.).

It is no doubt true that all such bodies "adjudicate," *i. e.*, they determine facts, apply a rule of law to those facts, and thus arrive at a decision. But there is nothing "inherently judicial" about "adjudication." To be a federal officer and to adjudicate are necessary but not sufficient conditions for the exercise of federal judicial power, as we recognized almost a century and a half ago.

> "That the auditing of the accounts of a receiver of public moneys may be, in an enlarged sense, a judicial act, must be admitted. So are all those administrative duties the performance of which involves an inquiry into the existence of facts and the application to them of rules of law. In this sense the act of the President in calling out the militia under the act of 1795, [*Martin* v. *Mott*,]

12 Wheat. 19 [(1827)], or of a commissioner who makes a certificate for the extradition of a criminal, under a treaty, is judicial. But it is not sufficient to bring such matters under the judicial power, that they involve the exercise of judgment upon law and fact." *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 280 (1856).

Accord, Bator, The Constitution as Architecture: Legislative and Administrative Courts Under Article III, 65 Ind. L. J. 233, 264–265 (1990). The first Patent Board, which consisted of Thomas Jefferson, Henry Knox, and Edmund Randolph in their capacities as Secretary of State, Secretary of War, and Attorney General, respectively, 1 Stat. 109, 110 (1790), adjudicated the patentability of inventions, sometimes hearing argument by petitioners. See 18 J. Pat. Off. Soc. 68–69 (July 1936). They were exercising the *executive* power. See Easterbrook, "Success" and the Judicial Power, 65 Ind. L. J. 277, 280 (1990). Today, the Federal Government has a corps of administrative law judges numbering more than 1,000, whose principal statutory function is the conduct of adjudication under the Administrative Procedure Act (APA), see 5 U. S. C. §§ 554, 3105. They are all *executive* officers. "Adjudication," in other words, is no more an "inherently" judicial function than the promulgation of rules governing primary conduct is an "inherently" legislative one. See *Standard Oil Co. of New Jersey* v. *United States*, 221 U. S. 1 (1911); APA, 5 U. S. C. § 553 ("Rule making").

It is true that Congress *may* commit the sorts of matters administrative law judges and other executive adjudicators now handle to Article III courts — just as some of the matters now in Article III courts could instead be committed to executive adjudicators. "[T]here are matters, involving public rights, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which Congress may or may not bring within the cognizance of the courts of the United

States, as it may deem proper." *Murray's Lessee, supra,* at 284. See also *Ex parte Bakelite Corp.,* 279 U. S. 438, 451 (1929). Congress could, for instance, allow direct review by the courts of appeals of denials of Social Security benefits. It could instead establish the Social Security Court—composed of judges serving 5-year terms—within the Social Security Administration. Both tribunals would perform identical functions, but only the former would exercise the judicial power.

In short, given the performance of adjudicatory functions by a federal officer, it is the identity of the officer—not something intrinsic about the mode of decisionmaking or type of decision—that tells us whether the judicial power is being exercised. "[O]ur cases demonstrate [that] a particular function, like a chameleon, will often take on the aspect of the office to which it is assigned." *Bowsher* v. *Synar,* 478 U. S. 714, 749 (1986) (STEVENS, J., concurring in judgment). Cf. *INS* v. *Chadha,* 462 U. S. 919, 953, n. 16 (1983). Where adjudicative decisionmakers do not possess life tenure and a permanent salary, they are "incapable of exercising any portion of the judicial power." *Ex parte Randolph,* 20 F. Cas. 242, 254 (No. 11,558) (CC Va. 1833) (Marshall, C. J.).

The Tax Court is indistinguishable from my hypothetical Social Security Court. It reviews determinations by Executive Branch officials (the Internal Revenue Service) that this much or that much tax is owed—a classic executive function. For 18 years its predecessor, the Board of Tax Appeals, did the very same thing, see H. Dubroff, The United States Tax Court 47–175 (1979), and no one suggested that body exercised "the judicial power." We held just the opposite:

> "The Board of Tax Appeals is not a court. It is an executive or administrative board, upon the decision of which the parties are given an opportunity to base a petition for review to the courts after the administrative inquiry of the Board has been had and decided." *Old*

*Colony Trust Co.* v. *Commissioner*, 279 U. S. 716, 725 (1929) (Taft, C. J.).

Though renamed "the Tax Court of the United States" in 1942, it remained "an independent agency in the Executive Branch," 26 U. S. C. § 1100 (1952 ed.), and continued to perform the same function. As an *executive* agency, it possessed many of the accoutrements the Court considers "quintessentially judicial," *ante*, at 891. It administered oaths, for example, and subpoenaed and examined witnesses, § 1114; its findings were reviewed "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury," § 1141(a). This Court continued to treat it as an administrative agency, akin to the Federal Communications Commission (FCC) or the National Labor Relations Board (NLRB). See *Dobson* v. *Commissioner*, 320 U. S. 489, 495–501 (1943).

When the Tax Court was statutorily denominated an "Article I Court" in 1969, its judges did not magically acquire the judicial power. They still lack life tenure; their salaries may still be diminished; they are still removable by the President for "inefficiency, neglect of duty, or malfeasance in office." 26 U. S. C. § 7443(f). (In *Bowsher* v. *Synar, supra,* at 729, we held that these latter terms are "very broad" and "could sustain removal . . . for any number of actual or perceived transgressions.") How anyone with these characteristics can exercise *judicial* power "independent . . . [of] the Executive Branch" is a complete mystery. It seems to me entirely obvious that the Tax Court, like the Internal Revenue Service, the FCC, and the NLRB, exercises executive power. Amar, *Marbury*, Section 13, and the Original Jurisdiction of the Supreme Court, 56 U. Chi. L. Rev. 443, 451, n. 43 (1989). See also *Northern Pipeline*, 458 U. S., at 113 (WHITE, J., dissenting) (equating administrative agencies and Article I courts); *Samuels, Kramer & Co.* v. *Commissioner*, 930 F. 2d 975, 992–993 (CA2 1991) (collecting academic authorities for same proposition).

In seeking to establish that "judicial power" in some constitutionally significant sense—in a sense different from the adjudicative exercise of *executive* power—can be exercised by someone other than an Article III judge, the Court relies heavily upon the existence of territorial courts.  *Ante*, at 889–891.  Those courts have nothing to do with the issue before us.[5]  I agree that they do not exercise the national *executive* power—but neither do they exercise any national *judicial* power.  They are neither Article III courts nor Article I courts, but Article IV courts—just as territorial governors are not Article I executives but Article IV executives.

> "These Courts, then, are not constitutional Courts, in which the judicial power conferred by the Constitution on the general government, can be deposited.  They are incapable of receiving it.  They are legislative Courts, created in virtue of the general right of sovereignty which exists in the government, or in virtue of that clause which enables Congress to make all needful rules and regulations, respecting the territory belonging to the United States. . . . In legislating for them, Congress exercises the combined powers of the general, and of a *state* government." *American Ins. Co. v. Canter*, 1 Pet., at 546 (Marshall, C. J.) (emphasis added).

---

[5] Sadly, the Court also relies on dicta in *Williams* v. *United States*, 289 U. S. 553 (1933), an opinion whose understanding of the principles of separation of powers ought not inspire confidence, much less prompt emulation. It includes, for example, the notion that all disputes over which Article III provides jurisdiction can only be committed to Article III courts, *id.*, at 580–581; see also D. Currie, Federal Courts 145–146 (1982)—which would make the Tax Court unconstitutional.  *Williams* has been declared an "intellectual disaster" by commentators.  P. Bator, D. Meltzer, P. Miskin, & D. Shapiro, Hart & Wechsler's The Federal Courts and The Federal System 468 (3d ed. 1988); Bator, The Constitution as Architecture: Legislative And Administrative Courts Under Article III, 65 Ind. L. J. 233, 242–243, n. 30 (1990) ("I could devote a whole lecture to the ways in which [the reasoning of *Williams*] is erroneous").

Or as the Court later described it:

> "[Territories] are not organized under the Constitution, nor subject to its complex distribution of the powers of government, as the organic law; but are the creations, exclusively, of the legislative department, and subject to its supervision and control." *Benner* v. *Porter*, 9 How. 235, 242 (1850).

Thus, Congress may endow territorial governments with a plural executive; it may allow the executive to legislate; it may dispense with the legislature or judiciary altogether. It should be obvious that the powers exercised by territorial courts tell us nothing about the nature of an entity, like the Tax Court, which administers the general laws of the Nation. See *Northern Pipeline, supra,* at 75–76 (opinion of Brennan, J.).

The Court claims that there is a "longstanding practice" of permitting Article I courts to appoint inferior officers. *Ante,* at 890. I am unaware of such a practice. Perhaps the Court means to refer not to Article I courts but to the territorial courts just discussed, in which case the practice would be irrelevant. As I shall discuss below, an Article I court (such as the Tax Court) that is not within any other department would be able to have its inferior officers appointed by its chief judge—not under the "Courts of Law" provision of Article II, § 2, but under the "Heads of Departments" provision; perhaps it is that sort of practice the Court has in mind. It is certain, in any case, that no decision of ours has ever approved the appointment of an inferior officer by an Article I court. *Ex parte Hennen,* 13 Pet. 230 (1839), which the Court cites, involved appointment by an Article III tribunal.

### III

Since the Tax Court is not a court of law, unless the Chief Judge is the head of a department, the appointment of the Special Trial Judge was void. Unlike the Court, I think he is.

I have already explained that the Tax Court, like its predecessors, exercises the executive power of the United States. This does not, of course, suffice to make it a "Departmen[t]" for purposes of the Appointments Clause. If, for instance, the Tax Court were a subdivision of the Department of the Treasury—as the Board of Tax Appeals used to be—it would not qualify. In fact, however, the Tax Court is a freestanding, self-contained entity in the Executive Branch, whose Chief Judge is removable by the President (and, save impeachment, no one else). Nevertheless, the Court holds that the Chief Judge is not the head of a department.

It is not at all clear what the Court's reason for this conclusion is. I had originally thought that the Court was adopting petitioners' theory—wrong, but at least coherent— that "Heads of Departments" means Cabinet officers. This is suggested by the Court's reliance upon the dictum in *Burnap* v. *United States*, 252 U. S. 512, 515 (1920), to the effect that the head of a department must be "'the Secretary in charge of a great division of the executive branch of the Government, like the State, Treasury, and War, *who is a member of the Cabinet*,'" *ante*, at 886 (emphasis added); by the Court's observation that "[t]he Cabinet-level departments are limited in number and easily identified," *ibid.;* and by its reliance upon the fact that in the Twenty-fifth Amendment "the term 'department' refers to Cabinet-level entities," *ante*, at 887. Elsewhere, however, the Court seemingly disclaims Cabinet status as the criterion, see *ante*, at 887, n. 4, and says that the term "Departmen[t]" means "executive divisions *like* the Cabinet-level departments," *ante*, at 886 (emphasis added). Unfortunately, it never specifies what characteristic it is that causes an agency to *be* "like a Cabinet-level department," or even provides any intelligible clues as to what it might have in mind. It quotes a congressional Committee Report that seemingly equates Cabinet status with inclusion within the statutory defintion of "'department'" in 5 U. S. C. § 101, *ante*, at 887 (quoting H. R. Rep.

No. 203, 89th Cong., 1st Sess., 3 (1965)), but this hint is canceled by a footnote making it clear that "Cabinet-like" character, whatever it is, is *not* "strictly limit[ed]" by that provision, *ante*, at 887, n. 4. Its approving quotation of *Burnap*'s reference to "a great division of the executive branch" might invite the guess that numerosity is the key—but the Department of Education has fewer than 5,000 employees, and the FCC, which the Court also appears willing to consider such a "'great division,'" *ante*, at 886, fewer than 1,800. See Employment and Trends as of March 1991, Office of Personnel Management, Table 2. The Court reserves the right to consider as "Cabinet-like" and hence as "Departments" those agencies which, above all others, are at the farthest remove from Cabinet status, and whose heads are specifically designed *not* to have the quality that the Court earlier thinks important, of being "subject to the exercise of political oversight and shar[ing] the President's accountability to the people," *ante*, at 886—namely, independent regulatory agencies such as the Federal Trade Commission and the Securities and Exchange Commission, *ante*, at 887, n. 4. Indeed, lest any conceivable improbability be excluded, the Court even reserves the right to consider as a "Departmen[t]" an entity that is not headed by an officer of the United States—the Federal Reserve Bank of St. Louis, whose president is appointed in none of the manners constitutionally permitted for federal officers, but rather by a Board of Directors, two-thirds of whom are elected by regional banks, see 12 U. S. C. §§ 302, 304, and 341. It is as impossible to respond to this random argumentation as it is to derive a comprehensible theory of the appointments power from it. I shall address, therefore, what was petitioners' point, what I originally took to be the point of the Court's opinion, and what is the only trace of a flesh-and-blood point that subsists: the proposition that "Departmen[t]" means "Cabinet-level agency."

There is no basis in text or precedent for this position. The term "Cabinet" does not appear in the Constitution, the

Founders having rejected proposals to create a Cabinet-like entity. See H. Learned, The President's Cabinet 74–94 (1912); E. Corwin, The President 97, 238–240 (5th rev. ed. 1984). The existence of a Cabinet, its membership, and its prerogatives (except to the extent the Twenty-fifth Amendment speaks to them), are entirely matters of Presidential discretion. Nor does any of our cases hold that "the Heads of Departments" are Cabinet members. In *United States* v. *Germaine*, 99 U. S. 508 (1879), we merely held that the Commissioner of Pensions, an official *within* the Interior Department, was not the head of a department. And, in *Burnap*, *supra*, we held that the Bureau of Public Buildings and Grounds, a bureau *within* the War Department, was not a department.

The Court's reliance on the Twenty-fifth Amendment is misplaced. I accept that the phrase "the principal officers of the executive departments" is limited to members of the Cabinet. It is the structural composition of the phrase, however, and not the single word "departments" which gives it that narrow meaning—"the principal officers" of the "executive departments" in gross, rather than (as in the Opinions Clause) "the principal Officer in each of the executive Departments," or (in the Appointments Clause) simply "the Heads" (not "principal Heads") "of Departments."

The only history on the point also militates against the Court's conclusion. The 1792 Congress passed an "Act to establish the Post-Office and Post Roads within the United States," creating a Postmaster General and empowering him to appoint "an assistant, and deputy postmasters, at all places where such may be found necessary." § 3, 1 Stat. 234. President Washington did not bring the Postmaster into his Cabinet. See Learned, *supra*, at 233–249. It seems likely that the Assistant Postmaster General and Deputy Postmasters were inferior officers—which means either that "the Heads of Departments" include principal officers other than the Cabinet, or that the Second Congress and President

Washington did not understand the Appointments Clause. In any case, it is silly to think that the Second Congress (or any later Congress) was supposed to *guess* whether the President would bring the new agency into his Cabinet in order to determine how the appointment of its inferior officers could be made.

Modern practice as well as original practice refutes the distinction between Cabinet and non-Cabinet agencies. Congress has empowered non-Cabinet agencies to appoint inferior officers for quite some time. See, *e. g.*, 47 U. S. C. § 155(f) (FCC—managing director); 15 U. S. C. § 78d(b) (Securities and Exchange Commission—"such officers . . . as may be necessary"); 15 U. S. C. § 42 (Federal Trade Commission—secretary); 7 U. S. C. § 4a(c) (Commodity Futures Trading Commission—general counsel). In fact, I know of very few inferior officers in the independent agencies who are appointed by the President, and of none who is appointed by the head of a Cabinet department. The Court's interpretation of "Heads of Departments" casts into doubt the validity of many appointments and a number of explicit statutory authorizations to appoint.

A number of factors support the proposition that "Heads of Departments" includes the heads of all agencies immediately below the President in the organizational structure of the Executive Branch. It is quite likely that the "Departments" referred to in the Opinions Clause ("The President . . . may require the Opinion, in writing, of the principal Officer in each of the executive Departments," Art. II, § 2) are the same as the "Departments" in the Appointments Clause. See *Germaine, supra*, at 511. In the former context, it seems to me, the word must reasonably be thought to include all independent establishments. The purpose of the Opinions Clause, presumably, was to assure the President's ability to get a written opinion on all important matters. But if the "Departments" it referred to were only Cabinet departments,

it would not assure the current President the ability to receive a written opinion concerning the operations of the Central Intelligence Agency, an agency that is not within any other department, and whose Director is not a member of the Cabinet.

This evident meaning—that the term "Departments" means all independent executive establishments—is also the only construction that makes sense of Article II, § 2's sharp distinction between principal officers and inferior officers. The latter, as we have seen, can by statute be made appointable by "the President alone, . . . the Courts of Law, or . . . the Heads of Departments." Officers that are not "inferior Officers," however, *must* be appointed (unless the Constitution itself specifies otherwise, as it does, for example, with respect to officers of Congress) *by the President, "by and with the Advice and Consent of the Senate."* The obvious purpose of this scheme is to make sure that all the business of the Executive will be conducted under the supervision of officers appointed by the President with Senate approval; only officers "inferior," *i. e.*, subordinate, to those can be appointed in some other fashion. If the Appointments Clause is read as I read it, all inferior officers can be made appointable by their ultimate (sub-Presidential) superiors; as petitioners would read it, only those inferior officers whose ultimate superiors happen to be Cabinet members can be. All the other inferior officers, if they are to be appointed by an Executive official at all, must be appointed by the President himself or (assuming cross-department appointments are permissible) by a Cabinet officer who has no authority over the appointees. This seems to me a most implausible disposition, particularly since the makeup of the Cabinet is not specified in the Constitution, or indeed the concept even mentioned. It makes no sense to create a system in which the inferior officers of the Environmental Protection Agency,

for example—which may include, *inter alios*, bureau chiefs, the general counsel, and administrative law judges—must be appointed by the President, the courts of law, or the "Secretary of Something Else."

In short, there is no reason, in text, judicial decision, history, or policy, to limit the phrase "the Heads of Departments" in the Appointments Clause to those officials who are members of the President's Cabinet. I would give the term its ordinary meaning, something which Congress has apparently been doing for decades without complaint. As an American dictionary roughly contemporaneous with adoption of the Appointments Clause provided, and as remains the case, a department is "[a] separate allotment or part of business; a distinct province, in which a class of duties are allotted to a particular person . . . ." 1 N. Webster, American Dictionary 58 (1828). I readily acknowledge that applying this word to an entity such as the Tax Court would have seemed strange to the Founders, as it continues to seem strange to modern ears. But that is only because the Founders did not envision that an independent establishment of such small size and specialized function would be created. They chose the word "Departmen[t]," however, not to connote size or function (much less Cabinet status), but separate organization—a connotation that still endures even in colloquial usage today ("that is not my department"). The Constitution is clear, I think, about the chain of appointment and supervision that it envisions: Principal officers could be permitted by law to appoint their subordinates. That should subsist, however much the nature of federal business or of federal organizational structure may alter.

I must confess that in the case of the Tax Court, as with some other independent establishments (notably, the so-called "independent regulatory agencies" such as the FCC and the Federal Trade Commission) permitting appointment of inferior officers by the agency head may not ensure the

high degree of insulation from congressional control that was the purpose of the appointments scheme elaborated in the Constitution. That is a consequence of our decision in *Humphrey's Executor* v. *United States*, 295 U. S. 602 (1935), which approved congressional restriction upon arbitrary dismissal of the heads of such agencies by the President, a scheme avowedly designed to made such agencies less accountable to him, and hence he less responsible for them. Depending upon how broadly one reads the President's power to dismiss "for cause," it may be that he has no control over the appointment of inferior officers in such agencies; and if those agencies are publicly regarded as beyond his control—a "headless Fourth Branch"—he may have less incentive to care about such appointments. It could be argued, then, that much of the *raison d'être* for permitting appointive power to be lodged in "Heads of Departments," see *supra*, at 903–908, does not exist with respect to the heads of *these* agencies, because they, in fact, will not be shored up by the President and are thus not resistant to congressional pressures. That is a reasonable position—though I tend to the view that adjusting the remainder of the Constitution to compensate for *Humphrey's Executor* is a fruitless endeavor. But in any event it is not a reasonable position that supports the Court's decision today—both because a "Cour[t] of Law" artificially defined as the Court defines it is even *less* resistent to those pressures, and because the distinction between those agencies that are subject to full Presidential control and those that are not is entirely unrelated to the distinction between Cabinet agencies and non-Cabinet agencies, and to all the other distinctions that the Court successively embraces. (The Central Intelligence Agency and the Environmental Protection Agency, for example, though not Cabinet agencies or components of Cabinet agencies, are not "independent" agencies in the sense of independence from Presidential control.)

In sum, whatever may be the distorting effects of later innovations that this Court has approved, considering the Chief Judge of the Tax Court to be the head of a department seems to me the only reasonable construction of Article II, §2.

\* \* \*

For the above reasons, I concur in the judgment that the decision below must be affirmed.