THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JACKIE LYNN CORRIE, Defendant-Appellant.

Fourth District   No. 4—97—0050

Argued October 21, 1997.—Opinion filed January 22, 1998.

W. Keith Davis (argued), of Jennings, Novick, Smalley & Davis, P.C., of Bloomington, for appellant.

Charles G. Reynard, State's Attorney, of Bloomington (Norbert J. Goetten, Robert J. Biderman, and David E. Mannchen (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

In November 1996, a jury convicted defendant, Jackie Lynn Corrie, of aggravated battery of a child, finding that she knowingly caused great bodily harm to her son, A.C. (born June 20, 1995), when he was under 13 years of age (720 ILCS 5/12—4.3(a) (West 1994)). The trial court later sentenced her to 30 months' probation, subject to various conditions. Defendant appeals, arguing that (1) the court erred in instructing the jury; (2) the State failed to prove her guilty beyond a reasonable doubt; and (3) the court erred in sentencing her. We affirm.

## I. BACKGROUND

At defendant's trial, the evidence showed the following. At approximately 7:15 a.m. on October 26, 1995, defendant's mother, Karen Skaggs, picked up A.C. (who was four months old at the time) and his four-year-old brother to take them to their baby-sitter's house. Skaggs testified that A.C. was sitting in his car seat when she arrived at defendant's house, and he appeared to be "fine." She stopped on the way to the baby-sitter's house to buy doughnuts and left the children in the car for a couple of minutes. When Skaggs dropped the children off at the baby-sitter's house, nothing seemed wrong with A.C. She left the baby-sitter's house shortly after 7:30 a.m.

Robin Champion, A.C.'s baby-sitter, testified that after Skaggs left, she put A.C. on the living room floor in his car seat. He was playing with some plastic toys and seemed fine. At some point, Champion began changing A.C.'s clothes and noticed "his whole body was limp," his head was tilted, and his eyes were partially closed. Champion then held A.C.'s hands and tried to get him to respond. After a few seconds to a minute, she called defendant, who stated "oh, my God, or oh, my gosh," but did not ask any questions about what was wrong with A.C. Champion denied shaking A.C. to get him to respond to her.

A.C. was transported from Champion's house to BroMenn Medical Center (BroMenn). At BroMenn, A.C. was initially diagnosed with "meningitis, encephalitis." Because his condition was worsening (he was experiencing seizures and a lessening level of alertness), he was transferred to St. Francis Medical Center (St. Francis) on the evening

of October 26, 1995. Soon after his admission, A.C. underwent a computerized axial tomography (CAT) scan and magnetic resonance imaging (MRI). A radiologist initially interpreted the CAT scan as normal and the MRI as showing some areas of irritation in the brain.

Dr. Robert Cruse is a child neurologist and professor at the University of Illinois College of Medicine. On October 30, 1995, Cruse took over A.C.'s care from Cruse's medical partner. On that date, Cruse examined A.C. and found him "sluggish, lethargic, *** [and without] purposeful movement." He also examined A.C.'s eyes and found hemorrhaging which had previously gone unnoticed. Cruse reviewed the previous CAT scan and found there was "blood on the original CAT scan that had not been appreciated." Cruse then reviewed the MRI and the CAT scan with a neuroradiologist (a radiologist specializing in brain hemorrhage), who agreed that the CAT scan revealed blood and the irritation shown on the MRI was "compatible with blood." Cruse stated that "[a]t that point[,] it was clear there had been bleeding in the brain." Cruse also stated that most of the blood was on the surface of A.C.'s brain, a condition which is "quite abnormal."

Cruse then called in two ophthalmologists to more thoroughly examine A.C.'s eyes. Cruse stated that their examinations confirmed the hemorrhage and showed retinal tears and blood on different layers of A.C.'s eyes. Cruse also stated that after reviewing their examination findings, he changed A.C.'s diagnosis from encephalitis to "shaken baby syndrome."

Dr. Cruse testified that "shaken baby syndrome is a term used for children who experience a vigorous, violent force of movement of their head forward and backwards." When a child is shaken, his head is "going violently forward and backward with an acceleration/deceleration force," which results in bleeding on the brain's surface between the skull and brain. Cruse also stated that such surface bleeding is typically the only symptom of shaken baby syndrome, and that, although he cannot give the exact amount of force required to cause the injuries suffered by A.C., it does require "a very vigorous and violent force." Cruse opined that the onset of symptoms occurs within "a few hours" of a baby being shaken. He also opined that A.C.'s injuries were significant, stating that the life-threatening injuries "put him in [the] Intensive Care Unit, [and] caused coma and seizure[s] and hemorrhage to his brain."

Dr. Peter Lagouros was one of the ophthalmologists who conducted an eye examination on A.C. He observed hemorrhage with schisis (a splitting of the retinal layers) within both retinas and blood in the front of the retinas. Lagouros opined that the combination of

schisis and hemorrhage "is tantamount of Shaken Baby Syndrome, meaning there cannot be other causes." On cross-examination, Lagouros stated that it is possible for shaken baby syndrome to occur during vigorous resuscitation efforts on a baby. Lagouros also stated that the damage to the eyes of a baby suffering from shaken baby syndrome would "[d]evelop very quickly."

Jay Brenneman, an investigator for the Department of Children and Family Services (DCFS), testified that he first spoke with defendant on November 1, 1995, after Kathy McVey, a social worker at St. Francis, contacted DCFS. During the first interview, defendant gave the following story: (1) on October 25, 1995, she and her husband, John, went to bed around 10 p.m., at which time A.C. was fine; (2) defendant starting feeling ill during the night; (3) A.C. awakened around 3:30 a.m. and John fed him; (4) the next morning, John left for work without taking the children to the baby-sitter, so defendant called Skaggs and asked her to do so; and (5) defendant put A.C. in his car seat before Skaggs arrived.

At some point during the interview, Brenneman told defendant that he thought she knew what happened, and she replied, "Is it possible that I could have done this and not known it?" Brenneman said he did not believe so and that he wanted to know how many times she shook A.C. Defendant said, "You're right, but I only did it twice." Defendant stated that as she was preparing to feed A.C. at around 6:45 a.m. on October 26, 1995, he was "fussy." She shook him twice and told him to "wait a minute" for his bottle.

At this point in the interview, defendant began sobbing and said, "No, wait, I couldn't have done this. I am just telling you this so[ ] you won't take my children from me." John then came into the room, and Brenneman told John what had taken place in the interview. Brenneman told John he thought defendant knew in her heart what happened. He then left defendant and John alone, and when he returned, defendant again admitted shaking A.C. Defendant signed a written statement indicating that she had shaken A.C. twice and that she was sorry for what happened.

The State also presented other evidence of defendant's conflicting statements, in which she sometimes acknowledged that she had shaken A.C. and then later recanted, claiming that she had been coerced into making those admissions.

Defendant testified and denied ever shaking A.C. She stated that she was not feeling well on October 26, 1995, so she decided not to go to work. She called her mother around 7 a.m. and asked her to pick up the children and take them to the baby-sitter's house. Defendant put A.C. in his car seat around 7:05 or 7:10 a.m., and Skaggs arrived around 7:15 or 7:20 a.m. A.C. was smiling and "normal."

Defendant stated that during her initial interview with Brenneman, she denied any wrongdoing, and Brenneman began accusing her of shaking A.C. Defendant acknowledged that, at some point during the interview, she asked Brenneman if it was possible that she had injured A.C. and not realized it. He said "no," and defendant asked what was going to happen. When he discussed the placement options for the children, she decided to lie so that the children would be placed with family members. Defendant also claimed that she was pressured into admitting that she had shaken A.C., which she denied ever doing.

On cross-examination, defendant acknowledged that she knew that infants' heads are "particularly delicate" and should not be allowed to "flop" around. Defendant also stated that she had seen a flyer at work entitled, "Never Shake Your Baby." She denied that she had admitted shaking A.C. before John came into the room during the first interview. John testified and essentially corroborated defendant's version of events.

Dr. Mark Greenwald, an associate professor of ophthalmology at Northwestern University and an expert on shaken baby syndrome, testified on defendant's behalf. He stated that he does not know exactly how hard a person must shake a baby to cause shaken baby syndrome. He also stated that it is possible for a person to cause shaken baby syndrome in an accidental manner, "particularly by someone maybe relatively inexperienced *** with infants."

Greenwald first examined A.C. in December 1995, and he has treated him three or four times since. Greenwald diagnosed A.C. as having sustained a shaking injury and opined that A.C.'s vision in his left eye will be normal or close to normal, but his vision in his right eye might "suffer permanent visual loss."

On cross-examination, Greenwald testified that A.C.'s injuries could have been inflicted on October 26, 1995. He also stated that shaken baby syndrome does not occur "without repetitive deceleration." Greenwald further stated that he had never heard of a case in which a baby suffered shaken baby syndrome while strapped in a car seat.

On this evidence, the jury convicted defendant of aggravated battery of a child.

## II. ANALYSIS

### A. The Trial Court's Giving of the Pattern Instruction for Aggravated Battery of a Child

Defendant first argues that the trial court committed reversible error when it instructed the jury. Defendant contends that the court

needed to instruct the jury that, in order to find defendant guilty, it had to find more than that she knew she was causing her son "bodily harm"; defendant contends the jury had to find she knew she was causing "great bodily harm." Defendant tendered instructions to the court consistent with this theory, but the court rejected them and used the standard instructions instead.

The trial court instructed the jury in accordance with Illinois Pattern Jury Instructions, Criminal, Nos. 11.25 and 11.26 (3d ed. 1992) (hereinafter IPI Criminal 3d), which read, in pertinent part, as follows:

> "A person commits the offense of aggravated battery of a child when he, being a person of the age of 18 years or more, knowingly by any means, causes great bodily harm to any child under the age of 13 years." IPI Criminal 3d No. 11.25.

> "To sustain the charge of aggravated battery of a child, the State must prove the following propositions:
> *First Proposition*: That the defendant knowingly caused great bodily harm to [A.C.] ***." IPI Criminal 3d No. 11.26.

The trial court also instructed the jury in accordance with IPI Criminal 3d No. 5.01B, as follows: "A person acts knowingly with regard to the result of her conduct when she is consciously aware that such result is practically certain to be caused by her conduct."

The modifications of instructions No. 11.25 and 11.26 that defendant submitted—and the trial court rejected—read as follows:

> "A person commits the offense of Aggravated Battery of a Child when she, being a person of the age of 18 years or older, knowingly causes bodily harm to another; and, at the time she does so, she knows the harm caused is great bodily harm.

> To sustain the charge of aggravated battery of a child, the State must prove the following propositions:

> First Proposition: That the defendant knowingly caused bodily harm to [A.C.]; and

> Second Proposition: That at the time she caused the bodily harm, the defendant knew that the harm she caused was great bodily harm ***."

Defendant argues to this court essentially the same as she argued to the trial court, as follows:

> "The crux of Defendant's complaint is that the jury could have concluded that the defendant knew that she was causing 'bodily harm'; but in fact did not know that she was causing 'great bodily harm'. Under that analysis, and under the instructions of the Court, the jury would convict, notwithstanding the fact that such analysis overlooks the requirement that the jury find that the Defendant knew that she was causing 'great bodily harm' to her son."

In effect (but without ever saying so directly), defendant here argues that IPI Criminal 3d Nos. 11.25 and 11.26 do not correctly state the law. As did the trial court, we reject this argument.

The primary case defendant cited to the trial court (and cites again on appeal) in support of her claim is *People v. Shannon*, 206 Ill. App. 3d 310, 564 N.E.2d 198 (1990), in which the defendant was convicted of aggravated battery and appealed, in part, on the ground that the trial court committed reversible error when it refused to respond to an inquiry from the jury. In *Shannon*, the defendant was charged with throwing an object through the driver's window of a pickup truck and fracturing the driver's skull. However, the testimony conflicted as to how many of the youths present, in addition to the defendant, threw objects at the truck and whether the truck's driver had tried to run them over. *Shannon*, 206 Ill. App. 3d at 313, 564 N.E.2d at 200. The defendant contended that he did not throw the rock that hit the victim and, if he did, he did not intend serious injury.

The jury in *Shannon* was given the then-standard aggravated battery instructions (Illinois Pattern Instructions, Criminal, Nos. 11.05, 11.07, 11.08 (2d ed. 1981)) but during deliberations, it sent the following note to the trial court: "On the first proposition for Agg. Batt.[,] clarify is it intent to throw the Rock and it Resulted in great Bodily Harm or is it to throw the Rock intending to do great Bodily Harm." *Shannon*, 206 Ill. App. 3d at 315, 564 N.E.2d at 202. Defense counsel asked the court to inform the jury that the latter definition was correct, but the court refused, instead telling the jury to look at the instructions and use its common sense. The jury subsequently returned a verdict of guilty of aggravated battery.

As this recitation shows, the issue before this court in *Shannon* was not the appropriateness of the aggravated battery instructions; instead, the issue was whether the trial court erred by not responding to the jury's question. The *Shannon* court noted that although the IPI instructions regarding aggravated battery are readily understandable, the problem there arose because the jury might have been confused about the presumption that a person intends the natural and probable consequences of his act. The *Shannon* court noted that "[n]o instructions relative to this issue were given to the jury." *Shannon*, 206 Ill. App. 3d at 317, 564 N.E.2d at 203. Thus, the court concluded that, regardless of the instruction defining aggravated battery, "the jury could have based its verdict of guilt on [a] finding that the defendant did intend throwing the concrete, but without finding that beyond a reasonable doubt the defendant intended to cause the great bodily harm." *Shannon*, 206 Ill. App. 3d at 317, 564 N.E.2d at 203.

The analysis in *Shannon* does not apply to the present case for two reasons. First, the issue before us is not how the trial court should have responded to a question from the jury which revealed its confusion or uncertainty regarding the instructions it received; the jury here sent out no such note, and this record contains no indication that the jury had any trouble understanding the instructions it received. Second, and most significantly, the court in the present case gave the jury IPI Criminal 3d No. 5.01B, which had the practical effect of telling the jury about "the natural and probable consequences of [the defendant's] act," about which the court in *Shannon* expressed concern. In our judgment, IPI Criminal 3d No. 5.01B fully addresses defendant's concern that the jury here might have convicted her if it found only that she may have intended bodily harm, not great bodily harm.

■ In *People v. Novak*, 163 Ill. 2d 93, 115-16, 643 N.E.2d 762, 773-74 (1994), the supreme court addressed the issue of the adequacy of jury instructions and wrote as follows:

> "The purpose of jury instructions is to provide to the jury the correct legal principles applicable to the evidence, so that the jury may reach a correct conclusion according to the law and the evidence. [Citation.] In criminal cases, where Illinois Pattern Jury Instructions contain an applicable instruction giving due consideration to the facts and the governing law, the IPI instruction is to be used, unless the court determines that it does not accurately state the law. (134 Ill. 2d R. 451(a).) *In determining the adequacy of instructions, a reviewing court will consider all of the instructions as a whole to ascertain if they fully and fairly cover the law.*" (Emphasis added.)

Considering the instructions given in this case as a whole—as directed by *Novak*—we conclude that the trial court properly instructed the jury.

## B. Sufficiency of the Evidence

The material in this section is not to be published pursuant to Supreme Court Rule 23. 166 Ill. 2d R. 23.

## C. The Trial Court's Refusal To Sentence Defendant Pursuant to the "Special Penalty Provision"

Last, defendant argues that the trial court erred by refusing to sentence her pursuant to the "special penalty provision" set forth in section 12—4.3(b) of the Criminal Code of 1961 (Code) (720 ILCS 5/12—4.3(b) (West 1994)). That provision, since repealed by Public Act 89—313, effective January 1, 1996 (Pub. Act 89—313, § 5, eff. January 1, 1996 (1995 Ill. Laws 3420, 3420-21)), in effect provided for

a form of supervision for persons convicted of aggravated battery of a child—that is, the court was authorized to refrain from entering a judgment of guilt upon the convicted defendant and to place him or her upon probation. If the defendant fulfilled the terms and conditions imposed, "the court shall discharge such person and dismiss the proceedings." 720 ILCS 5/12—4.2(b)(2) (West 1994).

Prior to sentencing defendant, the trial court noted that she is a good person and a good parent, and the incident here "occurred in no more than a few seconds out of a life of 28-plus years." The court further noted that although defendant could have accepted responsibility for her conduct, she was "not going to be punished for exercising her right to go to trial." However, despite the extensive mitigating evidence defendant presented at her sentencing hearing, the court rejected the notion of sentencing defendant pursuant to section 12—4.3(b) of the Code (the "special penalty provision" under which a defendant may successfully complete probation and then have charges dismissed) (720 ILCS 5/12—4.3(b) (West 1994)). The court remarked that such a sentence would deprecate the seriousness of the offense, and this case did not constitute the "rare case" which warrants the special penalty provision. The court then sentenced defendant to 30 months' probation.

Defendant contends that the circumstances of this case showed her to be an excellent candidate for the "special probation provision" and that the trial court abused its discretion by denying her request to be sentenced pursuant to this special probation provision. Defendant claims that the court's explanatory remarks regarding why it was not going to sentence her under the special probation provision "can only be interpreted as the imposition of additional penalty on the defendant as a consequence of her decision to fight the case and go to trial."

In response, the State first contends that defendant waived any contention of error because she failed to object to the trial court's findings during the sentencing hearing. The State claims that defendant, having failed to object in the trial court, should be barred from raising this issue on appeal.

Since the State filed its brief, the supreme court decided *People v. Reed*, 177 Ill. 2d 389, 686 N.E.2d 584 (1997), holding that section 5—8—1(c) of the Unified Code of Corrections (Corrections Code) (730 ILCS 5/5—8—1(c) (West 1994)), as amended by Public Act 88—311, effective August 11, 1993 (Pub. Act 88—311, § 15, eff. August 11, 1993 (1993 Ill. Laws 2604, 2615)), requires that "sentencing issues be raised in the trial court in order to preserve those issues for appellate review." *Reed*, 177 Ill. 2d at 393, 686 N.E.2d at 586. The court went

on to hold that "the plain language now contained in section 5—8—1(c) shows a clear legislative intent to make a post-sentencing motion the functional equivalent of a post-trial motion for purposes of preserving issues for appeal." *Reed*, 177 Ill. 2d at 394, 686 N.E.2d at 586.

In *Reed*, the defendant was convicted of reckless homicide and aggravated driving under the influence of alcohol, sentenced to seven years in prison, and sought to challenge his sentence on appeal as excessive. The consolidated case involved defendant Turner, who was convicted of first degree murder and aggravated kidnapping and sentenced to consecutive prison terms of life in prison and 30 years. On appeal, Turner sought to argue that the trial court improperly considered certain factors during sentencing. The appellate court rejected both defendants' sentencing claims on the grounds that they were waived because neither defendant filed a postsentencing motion, as required by section 5—8—1(c) of the Corrections Code.

In its conclusion, the supreme court in *Reed* seemed to agree with that disposition and wrote as follows:

> "For the reasons stated, we find that defendants waived their contentions of error by failing to raise those issues in a post-sentencing motion in the trial court. Defendants do not argue that their sentencing challenges amount to plain error. Accordingly, the judgments of the appellate court are affirmed." *Reed*, 177 Ill. 2d at 395, 686 N.E.2d at 587.

At this court's request, the parties filed supplemental briefs addressing the effect of *Reed* on the issues before us. In her supplemental brief, defendant argues that *Reed* should not apply to her because the supreme court announced *Reed* during the pendency of her appeal. Defendant also argues that even assuming she waived the issue, the trial court's error amounted to plain error. We disagree.

### 1. Waiver (or, More Correctly, Forfeiture)

The supreme court's decisions generally apply to all cases that are pending—including pending on appeal—when the supreme court announces its decisions, unless the supreme court directs otherwise. *People v. Granados*, 172 Ill. 2d 358, 365, 666 N.E.2d 1191, 1194 (1996). Because the supreme court in *Reed* did not direct that its decision be applied prospectively only, *Reed* applies to the present case.

Nevertheless, defendant contends that *Reed* should not apply to her because (1) the appellate court districts had previously expressed conflicting views regarding the necessity of filing a postsentencing motion as a prerequisite to an appeal; and (2) she had followed *People v. Porter*, 285 Ill. App. 3d 50, 52, 676 N.E.2d 1, 3 (1996), in which this court held that section 5—8—1(c) of the Corrections Code, as amended, did not require the filing of a postsentencing motion.

Before addressing the issue of waiver further, we wish to discuss whether this issue is one of "waiver" at all. As our distinguished colleague, Justice McCullough, has written in dissent in an unrelated case, "Waiver is the intentional relinquishment of a known right. Why would a defendant ever knowingly give up a day of credit?" *People v. Moore*, 289 Ill. App. 3d 357, 365, 681 N.E.2d 1089, 1094 (1997) (McCullough, J., concurring in part and dissenting in part), *appeal denied*, 175 Ill. 2d 545 (1997) (nonprecedential supreme court supervisory order).

Justice McCullough's point is an excellent one and demonstrates the imprecise language courts of review too often use. In the present case, for example, we would be more accurate to frame the issue as follows: "did defendant *forfeit* her right to raise the issue of her sentence on appeal?" rather than asking whether she had *waived* that right.

This difference in terminology was discussed at some length in Justice Ryan's specially concurring opinion in *People v. Free*, 122 Ill. 2d 367, 379-81, 522 N.E.2d 1184, 1189-90 (1988) (Ryan, J., specially concurring), where Justice Ryan pointed out that *waiver* is an intelligent relinquishment of a known right or privilege, whereas a procedural default—such as allegedly occurred in this case—relates to a failure by counsel to comply with certain procedural requirements. This failure results in the *forfeiture* of the defendant's right to raise that error on appeal.

Justice Scalia has noted regarding the United States Supreme Court's use of the term "waive" instead of "forfeit," that "[t]he two are really not the same, although our cases have so often used them interchangeably that it may be too late to introduce precision." *Freytag v. Commissioner of Internal Revenue*, 501 U.S. 868, 894 n.2, 115 L. Ed. 2d 764, 790 n.2, 111 S. Ct. 2631, 2647 n.2 (1991) (Scalia, J., concurring in part and concurring in the judgment); see also *People v. Lann*, 261 Ill. App. 3d 456, 479 n.11, 633 N.E.2d 938, 954 n.11 (1994) (DiVito, J., concurring in part and dissenting in part) ("Our courts have long used the term 'waiver' when perhaps 'forfeiture' might have been more accurate"); see also T. O'Neill, *Terms "Waiver" and "Forfeiture" Often Interchanged in Error*, Chi. Daily L. Bull., August 22, 1997, at 5.

We agree with the views expressed by the foregoing distinguished jurists and scholars, and we take this opportunity to indicate that in the future, we will try to use the terms "waiver" and "forfeiture" more precisely. Accordingly, we now continue our analysis of whether defendant *forfeited* her right under *Reed* to raise on appeal the issue of her sentence.

In *People v. Crete*, 113 Ill. 2d 156, 497 N.E.2d 751 (1986), the supreme court rejected a defendant's argument that the court's interpretation of an earlier version of section 5—8—1(c) of the Corrections Code should not apply to his case where appellate court decisions on the issue were conflicting. In *Crete*, the supreme court interpreted section 5—8—1(c) of the Corrections Code to determine whether that statute's time period for the reduction or modification of a sentence was permissive or mandatory. The defendant argued that the statutory language was permissive and the court should interpret the statute to allow for a hearing on his motion to reduce his sentence. The supreme court in *Crete* noted that it had not previously addressed the issue and the decisions of the appellate court on the issue were conflicting. The court went on to conclude that the plain language of section 5—8—1(c) required that it be interpreted as mandatory. The court's interpretation defeated the defendant's claim, and the defendant argued that this interpretation should not be applied retroactively to his case. The supreme court rejected that argument, concluding that even though prior appellate court decisions had interpreted the statute in the manner urged by the defendant, the supreme court's decision did not constitute a change in the law which warranted prospective application only. *Crete*, 113 Ill. 2d at 163, 497 N.E.2d at 754.

Nor do we agree with defendant's contention that *Reed* should not apply to her because she relied upon a decision by this court (in the district in which her case arose), holding that section 5—8—1(c) of the Corrections Code does not require the filing of a postsentencing motion as a prerequisite to an appeal. In *Granados*, the supreme court addressed a defendant's contention that he had appropriately relied on a decision of his appellate district court (which conflicted with decisions in other districts), and it wrote as follows:

> "There is only one Illinois Appellate Court [citation], and that court's pronouncements on the present issue were unsettled at the time of the defendant's crimes. Since our appellate court expressed conflicting views on the issue, the defendant had no basis for allegedly relying upon only one of those conflicting views and ignoring the other view." *Granados*, 172 Ill. 2d at 371, 666 N.E.2d at 1197.

Thus, at the time of defendant's sentencing in this case, the decisions of the appellate court were conflicting on how to interpret the amended version of section 5—8—1(c) of the Corrections Code, and the supreme court had not yet addressed the amended version of section 5—8—1(c). Further, the supreme court in *Reed* did not direct that its decision be applied prospectively only. Under these circum-

stances, we conclude that *Reed* applies to defendant's case. Accordingly, we hold that defendant has forfeited any contentions of error at sentencing by failing to raise those issues in a postsentencing motion in the trial court.

In so holding, we note that the trial court did not admonish defendant that she needed to file a postsentencing motion to preserve for appeal any contentions of error at sentencing. We respectfully suggest that Supreme Court Rule 605 (145 Ill. 2d R. 605) be amended to require such an admonition so that defendants—such as the one in the present case—are put on notice that filing a postsentencing motion is a prerequisite to an appeal of sentencing issues.

### 2. *Plain Error*

The material in this section is not to be published pursuant to Supreme Court Rule 23. 166 Ill. 2d R. 23.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

KNECHT and GREEN, JJ., concur.