# Application of the Emoluments Clause to a Member of the FBI Director's Advisory Board

*A member of the FBI Director's Advisory Board does not hold an "Office of Profit or Trust" under the Emoluments Clause of the Constitution.*

June 15, 2007

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
FEDERAL BUREAU OF INVESTIGATION

You have asked whether a member of the Federal Bureau of Investigation ("FBI") Director's Advisory Board (the "Board") holds an "Office of Profit or Trust" under the Emoluments Clause of the Constitution. *See* U.S. Const. art. I, § 9, cl. 8. We conclude that he does not.

## I.

The Board is charged with advising the Director of the FBI ("Director") on how the FBI can more effectively exploit and apply science and technology to improve its operations, particularly its priorities of preventing terrorist attacks, countering foreign intelligence operations, combating cyber-based attacks, and strengthening the FBI's collaboration with other federal law enforcement agencies. *See* FBI Press Release, *FBI Director Renames and Announces Additions to Advisory Board* (Oct. 6, 2005) (available at http://www.fbi.gov/news/pressrel/press-releases/fbi-director-renames-and-announces-additions-to-advisory-board, last visited Aug. 11, 2014); *see also* Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7, § 109, 117 Stat. 11, 67 ("[The Board] shall not be considered to be a Federal advisory committee for purposes of the Federal Advisory Committee Act."). Board members serve, without terms, at the pleasure of the Director. The Board is scheduled to meet four times per year, unless the Director calls additional ad hoc meetings. Although Board members are entitled to travel reimbursements and are classified as special government employees, they receive no other compensation. *See* 18 U.S.C. § 202(a) (2000).

The sole role of the Board is to advise the Director, who is free to adopt, modify, or ignore its recommendations. Board members have no decisional or enforcement authority, and they exercise no supervisory responsibilities over other persons or employees as a result of their positions on the Board. Board members cannot bind the United States or direct the expenditure of appropriated or non-appropriated funds. In addition, Board members do not represent or act on behalf of the Director or the FBI in any particular matter. Board members hold Top Secret security clearances and may receive access to classified information pursuant to their service on the Board, although they do not possess any authority

to access, remove, disseminate, declassify, publish, modify, change, manipulate, originate, or otherwise regulate or oversee the government's handling of classified information. Members of the Board sign nondisclosure agreements in which they agree not to disclose classified information they receive.

You have indicated that several Board members wish to travel overseas at the invitation of foreign governments in connection with their non-FBI interests and wish to be reimbursed by those governments for their travel expenses. Travel reimbursements by foreign governments may constitute emoluments under the Emoluments Clause. *See, e.g.*, Memorandum for John G. Gaine, General Counsel, Commodity Futures Trading Commission, from Leon Ulman, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Expense Reimbursement in Connection with Chairman Stone's Trip to Indonesia* at 2 n.2 (Aug. 11, 1980).[1] The question before us is whether membership on the Board is an "Office of Profit or Trust under [the United States]" within the meaning of the Emoluments Clause. We conclude that it is not.

## II.

The Emoluments Clause provides, in relevant part, that "no Person holding *any Office of Profit or Trust under [the United States]*, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const. art. I, § 9, cl. 8 (emphasis added). "[I]n order to qualify as an 'Office of Profit or Trust under [the United States],' a position must, first and foremost, be an 'Office under the United States.'" *Application of the Emoluments Clause to a Member of the President's Council on Bioethics*, 29 Op. O.L.C. 55, 56 (2005) ("2005 Opinion") (second alteration in original). In the 2005 Opinion, we concluded that a member of the President's Council on Bioethics, an advisory board, did not hold an "Office under the United States" and therefore was not subject to the Emoluments Clause. As we stated there:

---

[1] Congress has already granted its consent under the Emoluments Clause for officials to receive reimbursement from foreign governments for certain foreign travel expenses. The Foreign Gifts and Decorations Act, 5 U.S.C. § 7342 (2000), allows employees, with the approval of their agencies, to receive payment of appropriate travel expenses for travel taking place entirely outside the United States. *Id.* § 7342(c)(1)(B)(ii). But that statute does not address what is often the most significant single expense incurred in foreign travel, the cost of the flight to and from the United States. We assume, for purposes of this opinion, that the travel reimbursement received by Board members constitutes compensation for services, and therefore is not prohibited under section 7342(b). *See, e.g.*, *Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156, 157 (1982) ("It seems clear that [the Foreign Gifts and Decorations Act] only addresses itself to gratuities, rather than compensation for services actually performed").

> The text of the Emoluments Clause suggests that an "Office of Profit or Trust under [the United States]" must be an "Office under the United States." . . . [T]o the extent that the phrase "of Profit or Trust" is relevant, it may serve to narrow an "Office . . . under [the United States]" to those that are "of Profit or Trust," or an "Office of Profit or Trust" may be synonymous with an "Office . . . under [the United States]," but it is clear that the words "of Profit or Trust" do not expand coverage of the Emoluments Clause beyond what would otherwise qualify as an "Office . . . under [the United States]."

*Id.* at 56–57 (first ellipsis and first and second brackets added). The threshold question, therefore, in determining whether a member of the Board holds an "Office of Profit or Trust under [the United States]" is whether a position on the Board is an "Office under the United States."

In the 2005 Opinion, we concluded that a purely advisory position is not an "Office under the United States." Our analysis emphasized that persons holding advisory positions of the sort at issue there did not exercise governmental authority. *Id.* at 63–64. After reviewing two centuries of caselaw, authoritative commentaries, and numerous opinions of this Office, we observed that "[i]nnumerable . . . authorities . . . make clear that an indispensable element of a public 'office' is the exercise of some portion of delegated sovereign authority." *Id.* at 67. *See generally Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 87 (2007) ("*Appointments Clause*") ("As a general matter, . . . one could define delegated sovereign authority as power lawfully conferred by the Government to bind third parties, or the Government itself, for the public benefit. . . . [S]uch authority primarily involves the authority to administer, execute, or interpret the law."). We therefore concluded: "To be an 'office,' a position must at least involve some exercise of governmental authority, and an advisory position does not." 2005 Opinion, 29 Op. O.L.C. at 64; *id.* at 71 ("As the Supreme Court made clear in *Buckley v. Valeo*, 424 U.S. 1 (1976), . . . an 'officer of the United States' exercises '*significant authority* pursuant to the laws of the United States,' *id.* at 126 (emphasis added)."); *accord Appointments Clause*, 31 Op. O.L.C. at 79, 86, 99–100.

The only relevant distinction between the advisory position at issue in the 2005 Opinion and membership on the Board is that a Board member may receive access to classified information in connection with his official duties.[2] To conclude that

---

[2] While the members of the President's Committee on Bioethics—the subject of the 2005 Opinion—received modest compensation for their services, *see* 2005 Opinion, 29 Op. O.L.C. at 55, the members of the Board are not compensated. We have previously concluded, however, that while "an emolument is . . . a common characteristic of an office," it "is not essential." *Appointments Clause*, 31 Op. O.L.C. at 119.

membership on the Board is an "Office of Profit or Trust" within the meaning of the Emoluments Clause, therefore, we would necessarily have to conclude that, by receiving access to classified information, Board members have received a delegation by legal authority of a portion of the sovereign power of the federal government.

The mere provision of access to classified information, however, is not such a delegation. Board members are given access to classified information solely to help them perform their advisory function; they have no discretionary authority to access, remove, disseminate, declassify, publish, modify, change, manipulate, or originate classified information. They do not have supervisory or oversight authority for the government's handling or regulation of classified information. *Cf.* 2005 Opinion, 29 Op. O.L.C. at 72–73 (discussing similar authority). Board members who receive such information do not thereby acquire "the right or power to make any . . . law, nor can they interpret or enforce any existing law," 1 Asher C. Hinds, *Hinds' Precedents of the House of Representatives of the United States* 604, 608 (1907), nor can they "hear and determine judicially questions submitted [to them]," *id.* at 607. Nor does their receipt of such information empower Board members to "bind the Government or do any act affecting the rights of a single individual citizen." *Id.* at 610; *accord Opinion of the Justices*, 3 Greenl. (Me.) 481, 482 (1822) ("The power thus delegated and possessed [by an officer], may be a portion belonging sometimes to one of the three great departments, and sometimes to another; still it is a legal power, which may be rightfully exercised, *and in its effects it will bind the rights of others . . . .*") (emphasis added). Rather, receipt of classified information only gives rise to a negative duty not to disclose that information to persons who may not lawfully have access to it. We do not understand the duty to safeguard classified information to constitute a portion of the sovereign power of the federal government. That duty is broadly analogous to the duty of any person entrusted with the due care of government property under his control, which—absent authority to alienate that property—has not traditionally been considered to constitute sovereign authority sufficient to render a position an "office." *See Appointments Clause*, 31 Op. O.L.C. at 90 (collecting authorities).

In addition, the Board members' duty of nondisclosure originates not in the statute creating the Board and establishing its duties, but in such authorities as confidentiality agreements executed by the Board members, Exec. Order No. 13292 (Mar. 25, 2003), 3 C.F.R. 196 (2003 Comp.), and generally applicable statutes penalizing the unauthorized disclosure of classified information, *see, e.g.*, 18 U.S.C. § 793(d), (f) (2000); *id.* § 798 (2000). *See generally Freytag v. Comm'r*, 501 U.S. 868, 881 (1991) (contrasting special trial judges, whose duties were "specified by statute," with special masters, who were hired "on a temporary, episodic basis, whose positions are not established by law, and whose duties and functions are not delineated in a statute"); *id.* at 901 (opinion of Scalia, J.) (agreeing with this analysis); Floyd R. Mechem, *A Treatise on the Law of Public*

*Offices and Officers* § 507, at 332 (1890) ("The authority of a public officer in any given case consists of those powers which are expressly conferred upon him by the act appointing him, or which are expressly annexed to the office by the law creating it or some other law referring to it, or which are attached to the office by common law as incidents to it."). Although we do not consider that fact dispositive, *see Appointments Clause*, 31 Op. O.L.C. at 117–18, it tends to confirm that Board members' duty of nondisclosure is simply ancillary to their advisory duties, which, as noted above, are not sufficient to render the position an "office" under the Appointments Clause, U.S. Const. art. II, § 2, cl. 2. It also tends to confirm that the Board members' duty of nondisclosure is indistinguishable from the general duty that any employee or even contractor with access to such information would have, rather than constituting some special authority associated with service on the Board.

Accordingly, we conclude that a member of the Board does not hold an "Office under the United States" by virtue of that position, and likewise does not hold an "Office of Profit or Trust [under the United States]" within the meaning of the Emoluments Clause. *See* 2005 Opinion, 29 Op. O.L.C. at 71 ("A position that carried with it no governmental authority (significant or otherwise) would not be an office for purposes of the Appointments Clause, and therefore . . . would not be an office under the Emoluments Clause . . . .").

We acknowledge that the 2005 Opinion, in concluding that members of the President's Council on Bioethics were not "officers" for purposes of the Emoluments Clause, noted, among other factors, that members did not have access to classified information, 29 Op. O.L.C. at 55, and cited a handful of opinions that "suggested that individuals with access to sensitive, national security-related information held 'Office[s] of Profit or Trust' under the Emoluments Clause, without further analyzing the extent of governmental authority exercised by these federal employees." *Id.* at 72; *see also id.* at 72 n.10 (collecting citations). In light of those opinions, we wrote, "it is at least arguable that the authority to control and safeguard classified information does amount to the exercise of governmental authority sufficient to render employment with the federal government a public 'office.'" *Id.* at 72.

One of those opinions involved a part-time staff consultant to the Nuclear Regulatory Commission. *See Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96 (1986) ("1986 Opinion").[3] In the 1986 Opinion, we concluded that such a staff consultant

---

[3] The 2005 Opinion also cites a Letter for James A. Fitzgerald, Assistant General Counsel, Nuclear Regulatory Commission, from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel (June 3, 1986). That is not, however, a separate opinion, but simply the unpublished version of the 1986 Opinion.

could not, consistent with the Emoluments Clause, accept employment with a private domestic corporation to perform work on a contract with a foreign government. *Id.* at 96. In reaching that conclusion, we appeared to place heavy weight on the fact that the consultant might have access to sensitive or classified information:

> [The consultant] is highly valued for his abilities and . . . in the course of his employment, he may develop or have access to sensitive and important, perhaps classified information. Even without knowing more specifically the duties of his employment, these factors are a sufficient indication that the United States government has placed great trust in [him] and requires and expects his undivided loyalty. Therefore, we believe the Emoluments Clause applies to him.

*Id*. at 99. In the 1986 Opinion, we did not consider whether access to classified information constitutes a delegation by legal authority of a portion of the sovereign power of the federal government. While we noted that "[p]rior opinions of this Office have assumed . . . that the persons covered by the Emoluments Clause were 'officers of the United States,'" *id*. at 98, we interpreted the Emoluments Clause as a "prophylactic provision" whose reach was not limited to "officers of the United States." *Id*. Instead, we concluded that the relevant inquiry under the Emoluments Clause was "whether [the employee's] part-time position at the NRC could be characterized as one of profit or trust under the United States—a position requiring undivided loyalty to the United States government." *Id*. As we have since determined, however, a person who does not hold an office under the United States is not subject to the Emoluments Clause. *See* 2005 Opinion, 29 Op. O.L.C. at 56 ("[I]n order to qualify as an 'Office of Profit or Trust under [the United States],' a position must, first and foremost, be an 'Office under the United States.'") (second alteration in original).

## III.

A sentence in our 2005 Opinion identifies *United States v. Hartwell*, 73 U.S. (6 Wall.) 385 (1867), as supporting the proposition that "the authority to control and safeguard classified information does amount to the exercise of governmental authority sufficient to render employment with the federal government a public 'office.'" 2005 Opinion, 29 Op. O.L.C. at 72. But, on a close reading of *Hartwell*, we find it consistent with our analysis above. In *Hartwell*, the Court held that a clerk in the office of an assistant treasurer of the United States was an "officer of the United States" for purposes of a federal embezzlement statute. 73 U.S. at 391–93. In reaching that conclusion, the Court noted a number of factors, including that Hartwell was "charged with the safe-keeping of the public moneys of the United

States." *Id.* at 392. By analogy to *Hartwell*, "it could be argued that a federal government employee charged with safeguarding sensitive national security-related information would likewise be a public officer charged with the exercise of some governmental authority." 2005 Opinion, 29 Op. O.L.C. at 72.

We do not read *Hartwell* so broadly. The statute under which Hartwell was indicted applied to "all officers and other persons charged by this act or any other act with the safekeeping, transfer and disbursement of the public moneys." 73 U.S. at 387 (emphasis and internal quotation marks omitted). The Court determined that Hartwell was both an "officer" and a "person charged with the safe-keeping of the public money within the meaning of the act." *Id*. at 393 (emphasis and internal quotation marks omitted); *see also id*. ("Was the defendant an officer or person 'charged with the safe-keeping of the public money' within the meaning of the act? We think he was both."). The fact that Hartwell was responsible for "the safe-keeping of the public moneys of the United States," *id*. at 392, was relevant, not because it made Hartwell an officer, but because it made him an "officer[] [or] other person[] charged by this act or any other act with the safe-keeping, transfer and disbursement of the public moneys." *Id.* at 387 (emphasis and internal quotation marks omitted). He therefore was liable for criminal prosecution under the act irrespective of the fact that he was an officer. *See id*. at 390–91.

That Hartwell was charged with the safekeeping of the public moneys of the United States does not appear to have been relevant to the Court's analysis of whether he was also an officer. Rather, Hartwell's status as an officer appears to have been based on the fact that his

> employment . . . was in the public service of the United States. He was appointed pursuant to law, and his compensation was fixed by law. Vacating the office of his superior would not have affected the tenure of his place. His duties were continuing and permanent, not occasional or temporary. They were to be such as his superior in office should prescribe.

*Id.* at 393. *Hartwell* therefore is not dispositive of whether being generally entrusted with due care of public funds is itself a delegation by legal authority of a portion of the sovereign power of the federal government, such that the recipient of such authority holds an "Office under the United States." *A fortiori*, *Hartwell* does not determine whether receiving access to classified information constitutes such a delegation.

## IV.

Because mere access to, or receipt of, classified information is not a delegation by legal authority of a portion of the sovereign power of the United States, a member of the Board does not hold an "Office under the United States" by virtue

of that position and therefore does not hold an "Office of Profit or Trust [under the United States]" within the meaning of the Emoluments Clause. *See* 2005 Opinion, 29 Op. O.L.C. at 72.[4] To the extent the 1986 Opinion reached a contrary conclusion, the 2005 Opinion has substantially undermined the basis for that conclusion, and the 1986 Opinion is no longer authoritative.[5]

JOHN P. ELWOOD
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[4] The FBI may, of course, take foreign ties into account in determining the propriety of a person's service on the Board and the appropriateness of granting security clearances.

[5] The 2005 Opinion referred to two other opinions in which "we suggested that individuals with access to sensitive, national security-related information held 'Office[s] of Profit or Trust' under the Emoluments Clause." 2005 Opinion, 29 Op. O.L.C. at 72; *see id*. at 72 n.10 (citing *Application of the Emoluments Clause of the Constitution and the Foreign Gifts and Decorations Act*, 6 Op. O.L.C. 156 (1982), and Memorandum for James H. Thessin, Assistant Legal Adviser for Management, Department of State, from John O. McGinnis, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Application of the Emoluments Clause to a Civilian Aide to the Secretary of the Army* (Aug. 29, 1988)). In both of those opinions, however, the individuals in question were regular full-time employees of the United States government, and those opinions therefore do not directly bear on the part-time advisory positions at issue here.